**ST. LOUIS COUNTY, Missouri, Plaintiff-Appellant,**

v.

**VILLAGE OF CHAMP, a Municipal Corporation of the State of Missouri, and Archie Null, Joseph F. Litteken, John E. Null, Carl C. Stifel and Edward W. Viehmann as Trustees of the Village of Champ, Defendants-Respondents.**

No. 53728.

Supreme Court of Missouri,

En Banc.

Feb. 10, 1969.

Rehearing Denied March 10, 1968.

Joseph B. Moore, St. Louis County Counselor, Thomas W. Wehrle, Deputy County Counselor, Morton I. Golder, Associate County Counselor, Clayton, for appellant.

O'Herin & Newberry, Malden, T. E. Lauer, Columbia, for respondents.

SEILER, Judge.

In this action, St. Louis County is seeking declaratory judgments declaring two annexations by the village of Champ illegal and seeking injunctive relief against the village.[1] The first annexation was in 1965, and was attacked by St. Louis County. While the action was pending, Champ proceeded with a second and larger annexation in 1967, which included the area covered in the 1965 annexation and other land, too. St. Louis County also attacked the second annexation. The trial court consolidated the two cases for trial. Strangely, there is no evidence in the record as to the number of acres covered by either annexation. In oral argument here, counsel for the county mentioned 300 to 350 acres as being in the first annexation, and then 750 to 850 acres once and 800 to 1,000 acres later as being in the second annexation. Counsel for Champ make no mention of acres at all. Plaintiff's exhibit 6 is a dim plat, almost unreadable, showing the outlines of the original village of Champ and an outline of the second annexation. We can see the latter runs west and southwest of the old limits to the Missouri River and north to Interstate 70. Plaintiff's exhibit 7 is a plat showing the first annexation, 1965, and shows a much smaller annexed area, also lying west of the original limits and extending north to Interstate 70, but not going nearly so far west as the 1967

---

1. Champ is a legal phenomenon. It exists only because there was laches on the part of the state in bringing an action to oust it in 1962, State ex inf. Eagleton v. Champ (Mo.Sup. banc) 393 S.W.2d 516, hereinafter referred to as Champ I.

annexation.[2] We know from Champ I, supra, that the original village of Champ consisted of 314.3 acres, which would be not quite one-half square mile. As nearly as we can tell from exhibit 6, the area sought to be annexed in 1967 is about 3½ times the size of the original village, so apparently it involves around 1,100 acres, or approximately 2 square miles. Judging from exhibit 7, the area sought to be annexed in 1965 is about the same size as the original village, so it involves only around 300 acres, City of Ash Grove v. Davis (Mo.App.) 418 S.W.2d 194, 198.

█ The trial court entered a general judgment for the defendant village and its trustees without making any findings of fact or conclusions of law. The judgment may have been on the theory that since the vote in the two annexation elections was unanimously in favor of annexation both in the village and in the area sought to be annexed, this ended the matter by virtue of § 71.920, RSMo 1967 Supplement, which declares that in such event, upon making certain filings with the clerk of the county where the municipality is located, " * * * the annexation shall be complete and final * * * ", notwithstanding the other provisions of Chapter 71.[3] St. Louis County, a political subdivision of the state, has appealed and hence under Art. V, § 3, 1945 Constitution, V.A.M.S., we have jurisdiction.

The evidence shows there have been changes, some actual and others prospective, in the areas now sought to be annexed since the attempt made by Champ to annex 3,100 acres in 1962 which culminated in the ouster adjudged in Champ I, supra, decided in 1965. Construction of the R. C. Can Company plant has been completed and it is in operation. It is in area No. 1. Its cost was $4,000,000. There is a state maintained service road in area No. 1 running from the R. C. Can building to McKelvey Road near the southeast corner of Champ. A 9,000-foot railroad spur has been built from the Chicago, Rock Island and Pacific Railroad main line on the south to the R. C. Can Company plant on the north. Apparently the spur, too, is in area No. 1. The village maintains the right of way and the track. A barge canal, 180 feet wide and 1½ miles in length, has been built, at a cost of $70,000, with industrial levees on each side. The record is silent as to its location, but presumably it must be near the Missouri River and so would be in the west part of area No. 2. A pumping station of sufficient size to handle the outflow of Fee Fee and Creve Coeur Creeks has been installed and dedicated to public use (it is believed, although not clear from the record, that these two creeks flow into the Missouri River over some part of the south portion of area No. 2 and we assume the pumping station, therefore, must also be in area No. 2. Evidently the idea is to improve the usefulness of unspecified portions of area No. 2 by reducing flooding from these two creeks). The pumping station cost $70,000. The American Beauty Macaroni Company has purchased 4 acres in the original village and started construction to the point of "some concrete pillars" on a plant which they expect to cost between $1,000,000 and $1,500,000. Century Electric Company has spent $270,000 in preparing a 30-acre site for its plant (evidently in area No. 1) adjacent to the R. C. Can plant. It expects its plant to cost $7,000,000. There is nothing to show the pace of construction or anticipated dates of completion on these two plants. A sewage disposal retention basin of 3½ acres has been constructed, to serve the R. C. Can Company, Century Electric, and American Beauty plants. Again the record does not show, but we assume the lagoon is in area No. 1. Sanitary sewer lines of approximately 1,700 feet have been extended to serve these three plants as well

---

2. Most of the time hereafter we will refer to the 1965 annexation as area No. 1 and to the additional territory included in the 1967 annexation as area No. 2.

3. In the 1965 election the vote was 10 to 0 in Champ and 5 to 0 in the annexed area. In the 1967 election it was 12 to 0 in Champ and 5 to 0 in the area.

as being available for future hookups by other plants. The Prestress Horizon Concrete plant has been completed and is in operation. It cost $500,000. As best we can make out from exhibit 6, this plant is in area No. 2, close to the Missouri River. There is an 8-acre fishing lake on private property (not clear whether in original village or in area No. 1) with an easement permitting use by the employees of R. C. Can Company and by citizens of Champ.

Part of a road (sometimes referred to as Creek Road and sometimes as Olympic Drive) which is to run in a northeast-southwest direction from St. Charles Rock Road on the north to Creve Coeur Mill Road on the south has been started by Champ or its backers. It is not clear from the record whether this road is in area No. 1 or area No. 2, but we judge it to be on or about the dividing line between the two. St. Louis County has agreed to accept Creek Road as a county road when construction has been completed in accordance with county standards and when "the legal aspects" in regard to its valid dedication to public use have been resolved (other litigation is in process as to whether some of the right of way north of Interstate 70, in an area not covered by either area No. 1 or No. 2, has been dedicated). The county engineer testified that what exists of Creek Road is not now in acceptable condition for county maintenance. Bill Bangert, the original incorporator of Champ, testified about 2,200 feet of Creek Road has been constructed south of Interstate 70. He described it as a 10-inch rolled stone base with double sealed asphalt penetration wearing surface. He said the grading work had been done on an additional 5,000 feet.

Creek Road is to pass under Interstate 70 "at approximately station 106 + 60", which seems to be the location where Interstate 70 now bridges what used to be a creek bed. Champ has a contract with the Missouri State Highway Commission authorizing the village to construct such a crossing under Interstate 70 and also an interchange. A traffic survey has been made. Plans and specifications have been prepared for a full clover leaf design, which have been approved by the highway commission and the federal Bureau of Roads. There was testimony that between $400,000 and $500,000 had been deposited with the highway commission on behalf of Champ toward cost of construction. Construction on the proposed interchange has not progressed beyond the planning stage pending resolution of the case at bar and the litigation over the dedication of a portion of Creek Road. There was general agreement that completion of Creek Road from north to south and the interchange would improve traffic conditions on Creve Coeur Mill Road and McKelvey Road, which lie generally south of or along the south side of the original village and the annexed areas.

About 25 people live in Champ. Champ has a town marshal and a village secretary. It has no street department, fire department or police department. The village has fire protection through the Pattonville-Bridgeton fire department. There is nothing in the record as to the quality of this service or the extent to which it would be available in the annexed areas. The village has no garbage disposal or sewer system. Its residents use septic tanks. Champ and the surrounding area, as does most of St. Louis County, get electricity, gas, water, and telephone service from the same private utilities. If Champ levies taxes or has a financial statement, there is no evidence of it in the record. There is little evidence as to what goes on in Champ in the way of business or commercial activity. There is no evidence that it has a downtown or business district.

There is nothing in the record as to land values per acre or other unit of measurement in either of the areas sought to be annexed or in the village of Champ. According to evidence put on by the county, altogether the St. Louis County Highway Board maintains approximately 1,000 miles of roads in unincorporated areas in the county and about 180 miles of roads in in-

corporated municipalities. In Champ it maintains only a short stretch, 180 feet, of what is called Penn Junction Road, serving a school located in the south part of Champ. In area No. 1 there is a short section of Creve Coeur Mill Road, "a few hundred feet", maintained by the county. There are no other county roads or county maintenance in either area No. 1 or area No. 2.

There are several roads in use in the original Champ limits. One of these roads is made of oil and gravel, the others of macadam. These are repaired by the people of Champ on a basis of "just as we need it we do that." There is a private continuation of the earlier mentioned R. C. Can road to the Prestress Horizon Concrete plant, for the people "who live down there" and evidently they take care of it.

The area sought to be annexed (by this we mean both area No. 1 and area No. 2) has two families, about 10 people altogether, living in it. It does not appear whether they live in area No. 1 or area No. 2. In the main the area is bottom land used for farming, with a few private roads. Although it is difficult to get into to patrol by the county police cars, the area is peaceful and seems to have no law violation problems, perhaps because "hardly anyone lives on it."

The chairman of the Champ Board of Trustees stated the general purpose of the annexation is to attract industrial plants to be built by revenue bonds and leased back to private concerns. The already existing R. C. Can plant would also be purchased with the proceeds of revenue bonds and

leased back to the company. Several firms have announced their intention of moving into Champ if the same can be done for them. A British firm proposes to build a $25,000,000 fertilizer plant to be financed by revenue bonds (the record is not clear as to its location. The inference seems to be area No. 1). American Beauty Macaroni Company, of St. Louis, as earlier stated, wants to build a plant, as do Donnelly Printing Company (which expects to spend about $1,000,000) and Century Electric Company. These last two apparently have area No. 1 in mind as their location. All these are contingent, however, on financing by municipal revenue bonds and in at least two or three of the above projects application has been made to and approval granted by the Division of Commerce and Industrial Development, for municipal industrial revenue bonds as required by § 100.050, RSMo 1967 Supplement.[4]

One witness, an architect and city planner, testified that sites for industrial development are quite limited in the original village of Champ. He expressed the opinion the cash flow to Champ from industrial development in the annexed area would make it economically feasible for Champ to give municipal services to the land annexed. This statement was not further elaborated, explained, or documented. This witness also testified that there is still acreage available in the original village for a "very limited" type of industrial development, but not for large industrial complexes, which require large, flat areas. He also serves as the building commissioner for Champ and within the past year had approved

---

4. We note that §§ 100.050–070, RSMo 1967 Supplement, require a good deal of information be submitted by the municipality to the Division of Commerce and Industrial Development as to the proposed project, including a statement of terms upon which the facilities are to be leased and such other information as necessary to enable the division to determine whether the project " * * * will further the general welfare of the municipality and the state; and is economically feas-

ible and will not become a burden to the taxpayers of the municipality." The record before us, however, does not show what facts were presented to meet these requirements.

If we are correct that the proposed American Beauty Macaroni plant is within the existing boundary of the village of Champ, then Champ would not need either annexation in order to proceed with an election for the necessary revenue bonds for this plant.

plans for construction of four or five small businesses and a school addition in the village.

The county planning director testified that the area of the proposed annexations lies within a few miles of the St. Louis municipal airport and that there are manufacturing and industrial plants within 1 to 3 miles of the general area, in two directions. He identified a 1962 report made by a reputable firm of city planners which set forth a plan for laying out industrial development in Champ, but expressed his own opinion that the area should not be developed for industrial use. The director of the St. Louis County Business and Industrial Development Corporation testified that Champ and the areas sought to be annexed have a potential for industrial development and he had been in contact with several companies which expressed interest in locating there. He said the main drawback, in addition to proper zoning, was that the annexed area (probably referring to area No. 2) lies in the flood plain of the Missouri River and additional flood protection would be required for industry. He did not think annexation, however, was an essential to industrial development in the Champ area. He expressed the opinion that based on a survey made in April 1967, there was enough unoccupied industrial acreage available in the county to last for 10 years, without rezoning. He also testified that development of the annexed areas with revenue bonds would be detrimental to school districts, unnamed.

The president of Donnelly Printing Company, in explaining why his company selected Champ, said they had been unable to find suitable area elsewhere in the county; that in Champ there was available a combination of good rail and truck routes (the

clover-leaf interchange between Interstate 70 and the circumferential routes 244 and 270 is a short distance north and east of the original village).

St. Louis County operates under a home rule charter, adopted in 1950, with a broadly organized system of county government. According to its 1966 financial report the county area is 497 square miles, of which some 194 square miles are in 96 different incorporated municipalities. The balance of 303 square miles lies in unincorporated areas. The population of the county has been increasing rapidly: from 274,230 in 1940 to 406,349 in 1950, to 703,532 in 1960 and 909,000 in 1966. The county has a complete zoning and land-use ordinance for the unincorporated areas, adopted in 1965, after 5 years of study and public hearings. It was designed to meet the growth needs for a population increase to 1,200,000 or for a 20-year period.[5] Under the ordinance the area sought to be annexed by Champ is designated as "NU" or non-urban. Industrial use is not among the permitted land uses and developments specified by the district regulations for the non-urban district.[6] Farming is permitted and single family residences with not less than three acres lot area. Judging from the county zoning ordinance, exhibit 15, the proposed land use which Champ desires to make in the annexed areas would completely change the uses which could be made of the areas from farming and residential to industrial and manufacturing. According to the county zoning map, exhibit 14, with the exception of a small area south of area No. 1, all the territory north, south and west of the proposed annexation area is zoned non-urban. South and east of the limits of the original village, the zoning classifications for the most part are resi-

5. The work which went into preparation of the master zoning ordinance is related in Desloge v. County of St. Louis (Mo.Sup.) 431 S.W.2d 126.

6. It does not appear from the record, how, when, or under what circumstances the industrial activities and plants which we have mentioned as existing in area No. 1 and area No. 2 were given zoning clearance.

dential, except for two small areas which are commercial.

St. Louis County put on its auditor, health director, traffic commissioner, deputy planning director, deputy superintendent of police, commissioner of parks and public works director, who tesified as to the county-wide activities of and services performed by their various departments. St. Louis County provides services for many of its municipalities on a contract basis—police services, electrical, plumbing, building, weights and measures inspections, sanitation services and health inspections were among those named.

 St. Louis County asserts that despite the provisions of § 71.920, supra, relative to the effect of the vote favoring annexation being unanimous in the annexing municipality and in the territory to be annexed, the reasonableness of annexation is nevertheless subject to judicial review.[7] We agree with this. In Champ I, 393 S.W. 2d l. c. 531, the court said: "It has been firmly established in decisions of this court that reasonableness of annexation by a city always is the subject of judicial inquiry * * * [R]easonableness of annexation is the subject of such judicial inquiry even in instances in which the Sawyers Act is not applicable * * *" Accord: City of Hannibal v. Winchester (Mo.Sup. banc) 391 S.W.2d 279, 286. Otherwise, any village in St. Louis County, small enough to be sure of a unanimous vote, could succeed in annexing whatever amount of the adjacent unincorporated area of the county it could find where it was sure the one resident therein would vote in favor of annexation and by drawing the boundaries of the area so there would be no other voters included.

But granted that reasonableness of annexation is a matter of judicial determination, with the burden of proof, under the circumstances before us, being on the challenger to show the annexation is unreasonable, does St. Louis County have standing to maintain a declaratory judgment action challenging the validity of a municipal annexation? Champ says not, that the cases where the lawfulness of a municipal action has been challenged fall into two classes: (1) quo warranto actions brought by the state and (2) actions in which private persons living or owning property within the area sought to be annexed have as plaintiffs challenged the reasonableness of annexation or have been defendants in a declaratory judgment suit, generally brought under the Sawyers Act, § 71.015, RSMo 1959, V.A.M.S. St. Louis County, on the other hand, asserts that it has such an interest in the area and because of the effects of annexation on the county as a community, as to give it the right to challenge the annexation.

We cannot ignore the facts of life in St. Louis County. It is not a rural area with low population density and no growth problems. There is only so much unincorporated area left. There are 96 separate incorporated municipalities, most of them growing and many attempting annexations.[8] The population of the county has

---

7. Sec. 71.920 provides as follows: "City limits may be extended by ordinance if approved by unanimous affirmative vote in both elections.—In the event that the proposition to annex such territory is approved by a unanimous affirmative vote in both the annexing municipality and the territory sought to be annexed, the annexing municipality, other provisions of this chapter notwithstanding, shall extend its limits by ordinance to include such territory, specifying with accuracy the new boundary lines to which the city, town or village limits are extended. Upon duly enacting such annexation ordinance, the municipality shall cause three certified copies of the same to be filed with the clerk of the county wherein the municipality is located, whereupon the annexation shall be complete and final and thereafter all courts of this state shall take judicial notice of the limits of that municipality as so extended."

8. In the City of Olivette case mentioned later herein, decided in 1963, the court was told there were then 29 annexation suits pending in St. Louis County.

reached 909,000, an increase of almost 30% in the last six years. Somehow, somewhere, there must be an opportunity for St. Louis County as such to challenge the reasonableness of annexations which affect it directly. In City of Olivette v. Graeler (Mo.Sup.) 338 S.W.2d 827, a declaratory judgment action by the City of Olivette in connection with its proposal to annex an area adjoining it in St. Louis County, the county was not a party to the suit, yet in remanding the cause for a new trial, the court recognized the interest of the county as a community in proposed annexations, saying at 338 S.W.2d 1. c. 837–38: "There were 99 incorporated cities in St. Louis County at the time of the trial * * * There is a great deal of competition between other cities for the unincorporated territory adjoining them. * * *

" * * * The interest of the county as a community must be weighed against the claims of the city because the county's municipal powers are also provided by law and are a part of the public policy of the state * * *" See, also, the discussion as to the interest of St. Louis County as a community in annexation proceedings in City of Woodson Terrace v. Herklotz (Mo. App.) 349 S.W.2d 446, 450.

When the Olivette case came here the second time, after the new trial, 369 S.W. 2d 85, St. Louis County was a party by intervention[9] and one of the assertions on the appeal was that the proposed annexation was not in the best interest of St. Louis County as a community. In arriving at its decision that the proposed annexation was unreasonable, the court expressly stated, 369 S.W.2d 1. c. 94, that " * * * the interests of the 'county as a community' outweigh the claims of Olivette * * * Our ruling * * * requires a consideration of the interest of the County in the area generally and the effects of the pro-

posed annexation, not only in connection with services rendered, but in a loss of control of the area and in such other ways as would vitally affect the County. Much water has gone over the dam since * * * [early] St. Louis County annexation cases * * * The County population has increased vastly and shifted; it has been desirable and necessary to develop very substantial industries and industrial areas in locations outside of the municipalities * * *

" * * * It seems obvious that in this highly developed and substantially urbanized community we have a situation materially different from those which exist in annexation proceedings elsewhere * *

"We are wholly unwilling, at this time at least, to consider the St. Louis County government organization as an 'interim device', intended to operate merely during a transition period * * * So long as the County has an effective county organization, it should not be whittled away to a mere shell by annexations which have as their prime purpose the acquisition of more city taxes. It would seem that ultimately there must be some overall and far-reaching solution to this problem, but such a solution is outside the domain of this case * * *"

The two Olivette cases were tried in 1957 and 1961 and decided here in 1960 and 1963, respectively. In the interim since Olivette I and II the problem of conflicting interests of St. Louis County and its numerous municipalities has become greater, not less, by reason of the constitutional enactments and statutes permitting municipalities to finance the construction of plants for manufacturing and industrial development purposes by revenue bonds and then to lease or otherwise dispose of them, Art. VI, § 27, 1945 Constitution as amended, and §§ 100.010–200, RSMo 1967 Supplement.

9. One of the grounds alleged by St. Louis County in opposition to the annexation was that it would be "detrimental, harmful, and injurious to the health, welfare and convenience of the inhabitants of the area sought to be annexed and to that of the public of St. Louis County, Missouri as a whole."

The incentives to annexation thus are now greater than before, as the case before us well illustrates, and the need for the far-reaching solution so far as St. Louis County is concerned mounts.

By amending Chapter 71 in 1963 by the addition of new §§ 71.860–920, the legislature made it clear that so far as a village in a home rule charter county is concerned, the matter of extension of the boundaries was no longer to be decided by the county court (which in this case would have meant the St. Louis County Council) on the petition of the village, on the basis of evidence presented, on what the county court deemed "just and proper" as provided by § 80.030, RSMo 1959, V.A.M.S. Under the new sections, the judicial question is to be decided by a Sawyers Act proceeding under § 71.015, RSMo 1959, V. A.M.S., unless the vote is unanimous in both the village and the annexed area, in which case the municipality need not proceed by declaratory judgment, City of Kirkwood v. Allen (Mo.Sup. banc) 399 S.W.2d 30, 34, 39, but as we have held earlier, the question of reasonableness is still subject to judicial review, with the burden of proof being on the challenger to establish that the annexation is unreasonable, so that, in reality, the effect of § 71.920 is not to do away with judicial review but to change the burden of proof from the municipality to the one making the protest. At any rate, we are convinced that St. Louis County as a real party in interest here, has a legally protectible interest at stake, and is entitled to maintain this declaratory judgment action. Champ's contention to the contrary is overruled.

■■ There is no question but that the evidence showed Champ's motivation for the annexations was to develop industry in the area by means of municipal revenue bond financing and lease-backs. It says this did not make the annexations unreasonable as a matter of law, while St. Louis County says "The development of an area into an industrial park by the use of revenue bonds and the purchase of private property by the Village with a lease back to a private concern are not proper or legal purposes for annexation", citing Champ I. However, as has been stated over and over in these annexation cases " * * * Each case is a separate problem to be considered on all its facts * * * ", City of St. Joseph v. Hankinson (Mo.Sup.) 312 S.W.2d 4, 17, and Champ I must be read in the light of its facts, which were that in spite of the statutory standards for annexation by a village prescribed by § 80.030, supra, the village of Champ, with less than sixteen taxable residents, was attempting to annex 3,100 acres of farm land " * * * so as to permit future developments thereon in a giant industrial park * * *." Champ I does not stand for the proposition that an annexation primarily for industrial development is per se in any and all circumstances unreasonable. As shown by the amendments of Art. VI, § 27, 1945 Constitution and the enactment of §§ 100.010–200, supra, the public policy of the state now favors more ambitious industrial development by municipalities. The revenue bond method of financing enables a municipality virtually to lift itself by its own bootstraps to a position where it can attract industry. Not infrequently this involves annexation as a part of the development. It is a matter of common knowledge that in the few years since the authorization of the revenue bond industrial development scheme, many Missouri municipalities have used it successfully, particularly the smaller and medium size cities and towns, which heretofore have found themselves unable to compete effectively to attract manufacturing and industrial development.[10]

10. This method of financing has been so popular, in fact, over the entire country, that Congress in 1968 enacted legislation depriving industrial development bonds issued after April 30, 1968, as to issues of $1,000,000 or more, except for certain exempt activities, of their tax-exempt status, P.L. 90–364, approved June 28, 1968; 26 U.S.C.A. § 103.

Recognizing that " * * * new laws and modern economic and social trends must be taken into consideration * * *", Olivette I, supra, 338 S.W.2d l. c. 837, and acknowledging the above mentioned change in public policy, it follows that consideration of whether the proposed annexation is "necessary [or perhaps we should say likely] to foster growth and prosperity" of the annexing city is now entitled to greater weight than it has previously received (although it has been mentioned in the decisions, State ex inf. Major v. Kansas City, 233 Mo. 162, 134 S.W. 1007, 1022; City of Tracy v. McCrea (Mo.App.) 374 S.W.2d 553, 556), but even so we are unable to sustain the judgment of the trial court. There simply is no reasonable factual basis for either annexation.

The village of Champ is not bursting at the seams. It is not growing into either area. On the record before us there is no residential, commercial or industrial expansion taking place within its present limits, except for the start in a limited way of one plant on 4 of its 314.3 acres. It has no present facilities or demonstrated future abilities for providing any sort of municipal services to the areas sought to be annexed. We have no information as to its resources. Whatever is being done in the way of municipal services at present in the areas sought to be annexed is being done by St. Louis County. Under the evidence there would be no change in this if the annexations were upheld, because the indications are that Champ would seek to contract with St. Louis County for the county to continue such services. There is no showing that the annexations are necessary or convenient to the proper exercise of the municipal government of the village. What development has occurred in area No. 1 and area No. 2 since Champ I is limited to use of the land for specific purposes, not in any way dependent upon Champ as a municipality or upon its limits being extended. On the whole record, therefore, both annexations are unreasonable.

The only real tie between Champ and the areas sought to be annexed is that annexation is a method of getting the plants built. This would make financing the main test of annexation. Financing inevitably enters industrial development, but from the judicial standpoint, the correct view is that if annexation is otherwise reasonable, the fact that it also provides a method of financing does not make it objectionable, but it cannot constitute the sole justification. The interest of St. Louis County as a community in the areas sought to be annexed outweighs the claims of the village, based, as we have pointed out, on the use of annexation as a means of financing.

Actually, when we examine what is sought as the end result of the present annexations—construction of new plants and purchase of the existing R. C. Can plant by revenue bonds and their subsequent lease-back to and operation by industrial tenants—there is no reasonable guarantee in the record that this would take place. There is nothing to show that bond buyers are likely to buy the revenue bonds which Champ proposes to issue or that such bonds could meet the practical requirements imposed by the market for a rating attractive to prospective purchasers. It is readily conceivable that the annexations might take place and not be followed by the anticipated industrial development at all. If so, there is no necessity or desirability for annexation in the first place, even on Champ's theory.

The judgment is reversed and the cause remanded with directions to the trial court to enter judgment in favor of the plaintiff in both cases and to enjoin the defendants from exercising jurisdiction over either of the areas purported to be annexed by virtue of the ordinances referred to in the petitions.

All concur except MORGAN, J., not participating because not a member of the court when cause was submitted.