336 So.2d 502 (1976)
CITY OF BIRMINGHAM, a Municipal Corporation
v.
COMMUNITY FIRE DISTRICT, a Public Corporation, et al.
SC 1373.
Supreme Court of Alabama.
June 25, 1976.
As Corrected On Denial of Rehearing August 6, 1976.
Johnson, North, Haskell & Slaughter, Birmingham, for appellant.
James M. Tingle, Harold T. Ackerman, Malcolm L. Wheeler, Birmingham, for appellees.
J. Fred Powell, William F. Murray, Jr., Birmingham, for U. S. Steel Corp., amicus curiae.
MERRILL, Justice.[1]
This appeal is from a judgment and decree setting aside an annexation election whereby the City of Birmingham, hereinafter Birmingham, proposed to annex certain territory in Pinson Valley, northeast of the city, under the provisions of Tit. 37, §§ 138-187, Code of Alabama 1940.
*503 The election was held on November 9, 1974, and resulted in the defeat of the proposed annexation. A contest of the election was initiated by Birmingham in the probate court which resulted in an order entered on February 3, 1975 changing the results in favor of the annexation.
Prior to the November 9 election, an appellee, the Community Fire District, and other intervenors, hereinafter "appellees," sought to enjoin the election on constitutional and statutory grounds. The appellees consisted of:
(1) Citizens within the proposed area to be annexed.
(2) Citizens within the present City Limits of the City of Birmingham;
(3) Property owners within the proposed area to be annexed;
(4) Property owners and citizens who were excluded arbitrarily from the area sought to be annexed;
(5) An adjoining municipality, the City of Tarrant City, which owned a sanitary land fill operation and substantial industrial plant located in the territory sought to be annexed; and
(6) A Fire District organized under the laws of the State who would lose substantially all of its territory by virtue of the proposed annexation.
The circuit court granted a temporary restraining order which was superseded by this court on November 8, but the probate court was enjoined and restrained from entering an order extending the corporate limits of Birmingham until a full hearing was held and the issues raised were determined. The matter thus stands in the status quo pending this appeal.
The cause came on to be heard in circuit court on May 21, 1975. The court issued its decree on June 26 in which the election was set aside because of six fatal, jurisdictional, statutory and constitutional errors committed. Birmingham appealed.
The first error listed by the trial court was that Birmingham had "gerrymandered" the Pinson Valley territory so as to insure the success of the November 9 election, and that the gerrymandering employed to form islands or enclaves of electors not favoring annexation by placing them outside the proposed boundaries was unreasonable, arbitrary and discriminatory.
We do not discuss the other five listed "errors" as we feel that the first "error" is dispositive of the case.
The trial court quoted the definition of the word "gerrymander" from Webster's Third New International Dictionary as follows:
"To divide an area into political units in an unnatural and unfair way with the purpose of giving special advantage to one group."
Birmingham had made surveys and taken polls to ascertain who would vote for and against annexation. Admittedly, they included territory where the vote would be favorable and excluded territory where it would not be favorable. They excluded the most populous communities in the eighteen square miles in Pinson Valley which they proposed to be annexed.
A look at the map shows the situation better than the use of many words. A corridor could have been formed on the north and west sides of the populous communities, but in their zeal to annex additional territory, Brimingham left these are-as as islands or enclaves either completely or primarily surrounded by the annexed territory. These islands or enclaves, as shown on the map are:
(1) Airport Hills
(2) Robinwood
(3) Pawnee Community
(4) Pinson Heights
(5) Mimosa and Ware Trailer Parks
(6) Carson Village
(7) Pinson
(8) Palmerdale
(9) Village Springs
An example of the treatment of residents who did not favor annexation can be seen in an examination of the Airport Hills community. Airport Hills is a densely populated, homogeneous, black community. The community *504 was about evenly divided on the question of annexation. Based upon the survey taken by Birmingham, the pro-annexation inhabitants were taken in but the non-annexation people were left off and were not permitted to vote on the question. The territory excluded was comprised of 188 residences. The divisions between those allowed to vote and those excluded were sometimes a street, and sometimes merely lot lines in the same block. The people living in these 188 residences were completely surrounded by the city limits of Birmingham and their only way of egress from their community would be the streets of Birmingham.
There can be no doubt that Birmingham arranged the boundary lines and predetermined the result of the election by eliminating most of the opposition, who were the predominant majority of the inhabitants of Pinson Valley.
The decree of the trial court is due to be affirmed for at least two reasons. First, the "gerrymandering" done by Birmingham in excluding voters known to be in opposition did not pass the reasonableness test. Second, that same action was unconstitutional.

THE REASONABLENESS TEST
The text writers state that an unreasonable annexation is invalid and subject to judicial scrutiny. "It has frequently been stated that a municipal corporation may not extend its boundaries by the annexation of territory * * * where it would be unreasonable to do so, and that an unreasonable annexation is invalid or void. (Citations Omitted) * * *." 2 McQuillin, Municipal Corporations, § 7.23 (Rev. Ed. 1966); Antieau, Municipal Corporation Law, § 1A.04 (1975).
Courts across the nation have expressed the law consolidated by treatise writers. The Supreme Court of Missouri, in St. Louis Co. v. Champ, 438 S.W.2d 205 (1969), stated as follows:
"It has been firmly established in decisions of this court that reasonableness of annexation by a city always is the subject of judicial inquiry. (Citations Omitted.)"
Missouri has a statute which allows annexation without an election, much as Alabama's Tit. 37, § 137 (which was not used in the instant case). The City of Champ was attempting to expand its borders under that statute by drawing lines of annexation which included only people whom it had predetermined to be in favor of the annexation. In holding such action unreasonable, the Missouri court illustrated that to hold otherwise would allow any city that could assure itself of a unanimous petition in favor of annexation to succeed in annexing whatever amount of adjacent country it could find, as long as it was sure the residents of the adjacent territory would petition in favor of the annexation. By so drawing the boundaries, a city could insure that a "no" vote would be included.
The case of Town of Fond du Lac v. City of Fond du Lac, 22 Wis.2d 533, 126 N.W.2d 201 (1964), is in point. Facts in that case indicate that annexation lines were drawn creating an island bounded on one side by the city's boundaries and on the other three sides by the city's proposed boundary lines of annexation. The electors in the island area were purposefully excluded from participation in the annexation because they were found to be against it.
The Wisconsin court, in Fond du Lac, stated:
"This court has authority to review the annexation of territory to a city or village and apply the test of reason. This principle was first announced in Smith v. Sherry (1880), 50 Wis. 210, 6 N.W. 561,. . . . The rule of reason applies to the exclusion of land consisting of an internal island as well as the inclusion of land by the external boundaries. The exclusion of land by the creation of an island within the city by the process of annexation must be as reasonably justified as the inclusion of the land around the island for city needs and purposes. A hole in a doughnut is natural but it must be proved so in a city. (Emphasis Supplied.)
*505 "The question is not whether the city can have only one continuous boundary line but whether the proposed boundary lines are reasonable in the sense they were not fixed arbitrarily, capriciously, or in the abuse of discretion. (Emphasis Supplied.)

* * * * * *
"[Such action, undertaken] solely for the purpose of assuring the success of the annexation was an arbitrary and capricious action and an abuse of discretion and invalidates the annexation."
With this, the Wisconsin court reminded municipalities that discretion to determine boundary lines of a city is not wholly without limitations and cannot transcend into the realm of arbitrary and capricious action.
As already stated, officials of Birmingham testified that they deliberately set the boundaries so as to prevent most of those who were going to vote "No" from voting on the issue at all. The fact that the lines were so drawn prevented the great majority of the inhabitants of Pinson Valley from voting although the proposed new city limits would either encircle them completely, or primarily encircle them.

THE CONSTITUTIONAL QUESTION
Article 1, § 13 of the Constitution of Alabama of 1901 provides:
"That all courts shall be open; and that every person, for any injury done him, in his lands, goods, person, or reputation, shall have a remedy by due process of law; and right and justice shall be administered without sale, denial, or delay."
In McCollum v. Birmingham Post Company, 259 Ala. 88, 65 So.2d 689, this court said:
"This section of our constitution [§ 13] secures every citizen against arbitrary action of those in authority and places him (or her) within the protection of the law of the land, * * *."
In State v. Bush, 12 Ala.App. 309, 68 So. 492, the Court of Appeals said:
"The manifest purposes of the quoted constitutional provisions, where life, liberty, and property are affected, are to secure the citizen against the arbitrary action of those in authority, and to place him under the protection of the law. The expression `due process of law' has been held to be the equivalent of `the law of the land.' * * *"
In Avery v. Midland, 390 U.S. 474, 88 S.Ct. 1114, 20 L.Ed.2d 45 (1968), the Supreme Court stated:
"It is now beyond question that a State's political subdivisions must comply with the Fourteenth Amendment. The actions of local government are the actions of the State."
Thus, it is apparent that a municipality's actions must meet the test of equal protection applicable to the right challenged. Voting has been held a fundamental right, and being classified as a fundamental right, in order to determine whether a voting rights violation is arbitrary, the strict test of equal protection should be applied. Evans v. Cornman, 398 U.S. 419, 90 S.Ct. 1752, 26 L.Ed.2d 370 (1969).
The Supreme Court of the United States has also held that residency can be an arbitrary restriction on votingviolative of equal protectionif the residency requirement fails to define the community truely affected. Carrington v. Rash, 380 U.S. 89, 85 S.Ct. 775, 13 L.Ed.2d 675. Further, that court has indicated a willingness to give effect to actual residency by piercing the individual's technical status with regard to voting rights. Evans v. Cornman, supra. That court also said in Kramer v. Union Free School District No. 15, 395 U.S. 621, 89 S.Ct. 1886, 23 L.Ed.2d 583 (1969):
When an election is to be held, absent a compelling state interest (the strict test of equal protection), qualified voters may not be excluded unless their stake in the outcome is substantially smaller than the stake of those allowed to vote. (Emphasis Supplied.)
The facts in this case show rank discrimination. People living on the same street and in the same block have the same interests, but those who were against annexation *506 were not allowed to register their choice because they were excluded from voting by the arrangement of the boundary lines.
In Pyle v. City of Shreveport, 215 La. 257, 40 So.2d 235, it was said:
"The arbitrary fixing of the boundary lines in such a manner as to exclude property in the same vicinity and the arbitrary exclusion of property within the boundaries is not only unreasonable but discriminatory."
Here, the only reason Birmingham excluded these islands or enclaves of population was that they knew that the people in the islands would vote "No."
In Township of Owosso v. City of Owosso, 25 Mich.App. 460, 181 N.W.2d 541, the court quoted with approval the following from a Kalamazoo case. There, the court had before it two cases where the boundaries had been gerrymandered so as to prevent an unfavorable vote:
"In the two cases now under consideration, the petitions asked for annexation elections which are gerrymandered under the terms of the Home Rule Act because they describe territories which are constructed so as to prevent defeat of the proposal by the residents of the enclaves created in the descriptions. This court feels that such a procedure is morally and legally wrong." (Emphasis Supplied.)
Statements in our recent case of Bethune v. City of Mountain Brook, 293 Ala. 89, 300 So.2d 350, authored by Justice Maddox, and quoting from an earlier case, are particularly apt here:
"* * * `The good faith of government should never be held less sacred than that of individuals.' * * *"
"`* * * The legal obligation and morality of the city or one of its boards should equal that of the marketplace.'"
We hold that the judgment of the circuit court must be affirmed on the ground that the gerrymandering action in designating the territory to be annexed was both unreasonable and unconstitutional.
The statutes, Tit. 37, §§ 138-187, provide that an election must be held by the people living in the territory to be annexed and a majority must vote for annexation. But the legislature never intended that the boundaries would be so arranged that most of those against annexation would be prohibited from voting. Those excluded had a right to voice their opinion as to who should govern them. As already shown, in some cases, neighbors in the same block or across the street could vote, but those excluded could not vote, only for the reason that Birmingham knew in advance that they were against annexation. To deprive them of their right to vote, especially when their interest was equal to that of their neighbors who were permitted to vote, was a violation of their rights under the Fourteenth Amendment to the Constitution.
Birmingham argues that City of Dothan v. Dale County Commission, 295 Ala. 131, 324 So.2d 772, is authority for reversal of the judgment here. We cannot agree. We agree with what this court said and held in that case. The only two common features in the cases are that both are annexation cases and both the proposed territories to be annexed were irregular in shape. City of Dothan is not apt authority.
Our affirmance does not mean that we agree with every reason given by the trial court in its opinion. We have affirmed on the grounds that the action of Birmingham in excluding the inhabitants by gerrymandering the boundaries was both unreasonable and unconstitutional.
A correct decision will not be disturbed because the trial court gave a wrong or insufficient reason therefor, Cherokee County v. Cunningham, 260 Ala. 1, 68 So.2d 507.
The dissent relies mainly on Hunter v. Pittsburgh, 207 U.S. 161, 28 S.Ct. 40, 52 L.Ed. 151 (1907), a landmark annexation decision, which allowed the City of Pittsburgh to consolidate with the City of Allegheny, after a majority of both cities' voters, counted together, had voted for the *507 annexation. In its opinion, the Court stated that "the state is supreme, and its legislative body, conforming its action to the state Constitution, may do as it will, unrestrained by any provision of the Constitution of the United States"; and further "The power is in the state, and those who legislate for the state are alone responsible for any unjust or oppressive exercise of it."
This was the law when eight of the present members of this Court were law students. But it is not now the law and has not been since 1960, when the U.S. Supreme Court modified its stance in Gomillion v. Lightfoot, 364 U.S. 339, 81 S.Ct. 125, 5 L.Ed.2d 110, and limited drastically the holding in Hunter, stating that a state's action or the action of a municipality under state action, once held unrestrained, is no longer allowed to go unchecked. The Court said: "All that the case [Hunter] held was (1) that there is no implied contract between a city and its residents that their taxes will be spent solely for the benefit of that city, and (2) that a citizen of one municipality is not deprived of property without due process of law by being subjected to increased tax burdens as a result of the consolidation of his city with another."
In Gomillion, supra, a legislative Act was passed setting up new boundaries of the City of Tuskegee, Alabama which, it was charged, "alters the shape of Tuskegee from a square to an uncouth twenty-eight-sided figure," and that this would "constitute a discrimination against them [the petitioners] in violation of the Due Process and Equal Protection Clauses of the Fourteenth Amendment to the Constitution and will deny them the right to vote in defiance of the Fifteenth Amendment."
The petitioners were residents who lived outside the new boundaries set in the legislative Act. The city relied on Hunter but the Court limited Hunter, rejected the "political thicket" theory and held, inter alia, that "Acts generally lawful may become unlawful when done to accomplish an unlawful end, * * * and a constitutional power cannot be used by way of condition to attain an unconstitutional result."
The case of Wilkerson v. City of Coralville, 8 Cir., 478 F.2d 709 (1973), cited and quoted in the dissent, is clearly distinguishable from our case because of the great difference in annexation law in Iowa and Alabama. Our case is based upon a deprivation of the right to vote on the question of annexation which is given by statute. Under the then existing law in Iowa, § 362.26, Code 1966, the voters in the territory proposed to be annexed were not permitted to vote on the question. The proposition of annexation was submitted only "to the voters of said city or town." If passed, the city was required to file "a suit in equity against the owners of the property proposed to be annexed" and the annexation depended upon the decree of the court. Judgment approving annexation was entered on June 23, 1969. There was no question of anyone's right to vote in Wilkerson.
Section 362.32 of the Iowa "Annexation or Severance" chapter provides for severance of territory from the city upon petition of a majority of the resident property owners of such territory in a suit in equity against the city. The successful conclusion of such a suit would probably result in the formation of a lawful island or enclave under Iowa law. Wilkerson was not a voting rights case and is not apt authority here.
The Iowa "annexees" had no right to vote so no constitutional right was violated. Alabama gives them that right and if, by depriving them of the constitutional right to vote by placing them in islands or enclaves, that action is both unreasonable and unconstitutional.
AFFIRMED.
BLOODWORTH, JONES, ALMON and EMBRY, JJ., concur.
HEFLIN, C. J., and MADDOX, FAULKNER and SHORES, JJ., dissent.

*508 ON REHEARING
MERRILL, Justice.
Opinion corrected and application for rehearing overruled.
BLOODWORTH, JONES, ALMON and EMBRY, JJ., concur.
HEFLIN, C. J., and MADDOX, FAULKNER and SHORES, JJ., dissent.
MADDOX, Justice (dissenting).
I cannot agree that the record here shows that "[t]here can be no doubt that Birmingham arranged the boundary lines and predetermined the result of the election." On the contrary, the evidence shows that the "gerrymandering" was not done solely to assure the success of the election, but was done to allow persons living adjacent to the annexed area an opportunity to come within the city. The record further shows that Birmingham's primary objective was to incorporate a substantial amount of land into the city for "industrial development," a legitimate municipal interest, and, in fact, a legitimate state interest, in view of the specific and concentrated emphasis which Alabama has given to industrial development during the past decade.
Unfortunately, I believe, the majority has jumped into a "political thicket" of drawing political boundaries. The majority even suggest that "[a] corridor could have been formed on the north and west sides of the populous communities." I do not believe that it is a judicial function to tell cities how they should draw their boundaries. While I do not question the power of this Court to review an annexation question, especially when there is "a sham or subterfuge," [Cf. City of Dothan v. Dale County Commission, 295 Ala. 131, 324 So.2d 772 (1975)], I believe the initial question is whether there was a legitimate municipal interest shown, and, if so, the only question remaining is whether the annexation was accomplished legally, from a statutory and constitutional standpoint.
As I view the law, municipal boundaries can be extended in Alabama by use of either one of three methods: (1) legislative act, (2) when all the owners of the annexed property consent, Act No. 2228, Acts of Alabama, 1971, p. 3585, carried as Title 37, Section 137(1), Code (Recomp. 1958), and (3) by holding an election as was done in this case; provided, however, no election is required if all the qualified electors in the proposed annexed area appear before the probate judge and consent in writing to the annexation. See the 1965 Amendment to Title 37, Section 136, Code, 1940, carried in the 1958 Recompiled Code as Title 37, Section 135(9).
Under Alabama's statutory annexation procedures, when an election is required, as it was here, the residents of the annexed area are the only ones who can vote. This procedure, as is apparent in this lawsuit, does not franchise all the people who are affected by an annexation. In any annexation, there are at least three classifications of people whose interests are affected: (1) those residing in the annexing city, (2) those residing in the annexed area, and (3) those arguably affected by the outcome of the electionwhat may be called the "source" areathe governmental unit or units of which the annexees, prior to annexation, were a part, such as a county government, a special purpose district, etc. In this case, the plaintiffs and intervenors represent interests in categories 2 and 3that is, persons living within the annexed area, and persons living outside the annexed area, but both affected by the annexation. Of course, the really tough question, not only in this case, but in any annexation, is: What voting rights do each of these groups have? Here, this Court is not presented with the rights of voters in the annexing city, but only with those of residents of the annexed area, and residents of the so-called "source" areas. What are the rights of residents in the annexed area? Do people living outside the annexing city and outside the annexed area have standing to claim the right to vote? More specifically, can people residing within the annexed area *509 claim a right to have people residing outside the area vote in the election? In this case, for example, which residents living outside the annexed area should have been permitted to vote? Every resident of every community around which the boundaries were drawn? If so, where is the community boundary? Is it established? For instance, some of the annexed territory was in Jefferson County and in Blount County. Are all the residents of Jefferson and Blount Counties entitled to vote? These questions point out that outside the annexing and annexed areas, both the degree of impact, and the area of impact, of annexation become extremely difficult to determine. This difficulty is the reason for the rule that the drawing of governmental boundaries, based as they are arbitrarily in most cases on political realities, are primarily left to the politicians. It is the reason courts have not been inclined to jump into the "political thicket." I regret that this Court has.
I quite agree that courts are not powerless, however. It has frequently been stated that a municipal corporation may not extend its boundaries by the annexation of territory where it would be unreasonable to do so, and that an unreasonable annexation is invalid or void. 2 McQuillin, Municipal Corporations, Section 7.23 (Rev. Ed. 1966).
In determining reasonableness, however, judicial scrutiny should be guided by the dramatic language of the landmark case of Hunter v. City of Pittsburgh, 207 U.S. 161, 178, 28 S.Ct. 40, 46, 52 L.Ed. 151 (1907):
"Municipal corporations are political subdivisions of the state, created as convenient agencies for exercising such of the governmental powers of the state as may be intrusted to them. For the purpose of executing these powers properly and efficiently they usually are given the power to acquire, hold, and manage personal and real property. The number, nature, and duration of the powers conferred upon these corporations and the territory over which they shall be exercised rests in the absolute discretion of the state. Neither their charters, nor any law conferring governmental powers, or vesting in them property to be used for governmental purposes, or authorizing them to hold or manage such property, or exempting them from taxation upon it, constitutes a contract with the state within the meaning of the Federal Constitution. The state, therefore, at its pleasure, may modify or withdraw all such powers, may take without compensation such property, hold it itself, or vest it in other agencies, expand or contract the territorial area, unite the whole or a part of it with another municipality, repeal the charter and destroy the corporation. All this may be done, conditionally or unconditionally, with or without the consent of the citizens, or even against their protest. In all these respects the state is supreme, and its legislative body, conforming its action to the state Constitution, may do as it will, unrestrained by any provision of the Constitution of the United States. Although the inhabitants and property owners may, by such changes, suffer inconvenience, and their property may be lessened in value by the burden of increased taxation, or for any other reason, they have no right, by contract or otherwise, in the unaltered or continued existence of the corporation or its powers, and there is nothing in the Federal Constitution which protects them from these injurious consequences. The power is in the state, and those who legislate for the state are alone responsible for any unjust or oppressive exercise of it."
Admittedly, the Supreme Court's holding in Hunter v. Pittsburgh, supra, contains broad language, and probably should not be read as holding that no constitutionally protected right is ever impaired by a boundary change. The majority opinion, however, would treat Hunter as being nothing but a historical decision about how it once was. I agree that Hunter does not prohibit judicial review of city boundary changes. In fact, Gomillion v. Lightfoot, 364 U.S. 339, 81 S.Ct. 125, 5 L.Ed.2d 110 (1960) rejects the *510 concept that courts cannot inquire. However, Hunter specifically holds that state action which permitted the voters of the larger city to overpower the voters of the smaller city, and compel the union of Pittsburgh with Allegheny, was not constitutionally impermissible.
Applying Hunter's doctrine of leaving annexation question to the states, what does the State of Alabama require to guarantee due process in annexation procedures? If the boundaries are drawn by the Legislature, of course, no person gets to vote. If all the owners of land contiguous to a city which does not lie within the police jurisdiction of another city petition the city, and the city agrees, the land can be annexed, regardless of the size and shape of the land and regardless of the fact that the annexed area encircles or excludes a similar area in the vicinity. If an election is required, Alabama law provides only for persons within the annexed area to vote. It is quite obvious, therefore, that a city could deliberately "gerrymander" an area contiguous to it and could only include areas where it knew the results of the election would be favorable, or unanimous. Is this unreasonable? Unquestionably, some courts have so held. The Wisconsin case of Town of Fond du Lac v. City of Fond du Lac, 22 Wis.2d 525, 126 N.W.2d 206 (1964), is a good example. It should be noted, however, that questions other than "gerrymandering" were presented in the Fond du Lac case, and two of the justices concurred in the result only "on the ground that signatures (on the annexation petition) were improperly obtained." But, even in Fond du Lac, the court found that the sole reason for the "gerrymandering" was to assure the success of the election. Other cases which have found "gerrymandering" to assure success in annexation elections to be unreasonable are as follows: St. Louis County v. Village of Champ, 438 S.W.2d 205 (Mo.1969); Pyle v. City of Shreveport, 215 La. 257, 40 So.2d 235 (1949) [dicta on rehearing].
These authorities from other jurisdictions are persuasive, but each dealt with provisions of their particular annexation statutes and we are dealing with annexations under Alabama law, which the Supreme Court of the United States, in Hunter, concluded was an area of state sovereignty. Even though we apply Alabama law, neither Alabama nor federal law would permit unequal treatment or violation of a person's rights without due process of law. There are times when courts can, and should, vacate annexation procedures which are discriminatory, but it should be done only when it is clearly shown from the evidence that an annexing city was guilty of a "sham or subterfuge." City of Dothan v. Dale County Commission, supra. As I interpret the thrust of the cases from the other jurisdictions, unjustified "gerrymandering" was vacated. Here, that is not the case. Even though the City of Birmingham used a preannexation survey, and was able to determine where opposition to annexation existed in the area, this proof, in and of itself, does not show arbitrary action. David Vann, then a city councilman, but now Mayor of Birmingham, who chaired a committee of the council concerned with annexation, stated the procedure followed by the city:
"Q Let's go ahead with a few more questions. Mr. Vann, did there come a time when the City of Birmingham conducted a survey of the Pinson Valley area to reflect its sentiment on whether or not the residences and voters of the area wanted to come into the City of Birmingham?
"A Well, we sent a letter to part of the registered voters in the area in which we stated that the council had tentatively decided to seek to annex the Pinson Valley development area; and, because of the tax exemptions which we were offering through industrial land owners, that we felt we had an obligation to offer the same kinds of tax exemptions to any residential areas in the vicinity that wished to take advantage of it. And, with this in mind, in order to see if there were any residential areas that wanted their area to be added to the industrial development area, we sent questionnaires into the area *511 and invited people to voluntarily respond."
It is also apparent from the record that the purpose of the annexation was for "industrial development." As the record shows, studies were made by the Rust Engineering Company, the Metropolitan Development Board, and the City Council's Committee on Municipal Development and Legislative Liason to determine what undeveloped territory surrounding the City of Birmingham was available for industrial expansion. As the testimony of Mayor Vann indicates, there arose a number of practical problems attendant to bringing certain of the residential centers in the Pinson Valley into Birmingham which were as persuasive to the City as the cumulative effect of the mixed responses to the survey questionnaire. These problems included: the feasibility of extending municipal services to these areas in the immediate future, the existence of county schools and school districts in the area which would have to be taken over by the City, the scarcity of registered voters in the mobile home parks, and the lack of city zoning ordinances regulating mobile home developments.
I am familiar with the rule stated in Kramer v. Union Free School District, 395 U.S. 621, 89 S.Ct. 1886, 23 L.Ed.2d 583 (1969), that when an election is to be held, absent a compelling state interest, qualified voters may not be excluded unless their stake in the outcome is substantially smaller than the stake of those allowed to vote. Some legal commentators argue that the voting rights principles developed in cases such as Kramer and Reynolds v. Sims, 377 U.S. 533, 84 S.Ct. 1362, 12 L.Ed.2d 506 (1964), and their progeny make unconstitutional several common voting plans used in annexation elections. See "The Right to Vote in Municipal Annexations," 88 Harvard L.Rev. 1571 (1975). However I do not believe that Kramer requires that every citizen arguably affected by an annexation has a right to vote.
In other words, I do not believe that the decisions of the Supreme Court of the United States in recent voter rights cases have extended the franchise to voters living outside the annexing or annexed areas. In short, I think the questions concerning the location of municipal boundaries is still primarily controlled by the rule announced in Hunter. I believe also that my reasoning is consistent with Alabama policy regarding municipal annexations. In Alabama, during the past decade, the legislative intent seems to favor liberalizing annexation laws. Act No. 2228, Acts of Alabama 1971 [Tit. 37 § 137(1)], which allows municipalities of more than 2,000 population to annex adjoining territory by ordinance with the consent of all the property owners involved is one example. Similarly, Act No. 402, Acts of Alabama 1966, [Tit. 37 § 135(9)] amended the annexation law to do away with the annexation election where all the voters in the territory to be annexed consented to the annexation in writing before the probate judge. It is apparent, therefore, that the Alabama Legislature has, within the past decade, liberalized annexation laws. In fact, in 1966, when Act No. 402 was passed, the Advisory Commission on Intergovernmental Relations was recommending that, at least in urban areas, inhabitants of a minor outlying territory should not possess an absolute power to veto the proposed annexation which met reasonable standards of equity. See Beckman, State Legislatures Helping Cities Meet Problems, the Alabama Municipal Journal, Vol. 23, No. 3, Sept. 1965, p. 24.
The critical question is presented: Was Birmingham's conduct unreasonable? The majority says it was. I do not believe it was. The record affirmatively shows that the territory proposed to be annexed was contiguous to the boundary of the City of Birmingham, and although it was irregular in shape and size, I know of no statutory mandate that the municipal boundaries of all territories sought to be annexed must form a regular shape. City of Dothan v. Dale County Commission, supra. Title 37 § 135(10), does require that such annexed territory "form a homogeneous part of the city or town." In this connection the census *512 tracts for the Birmingham, Alabama standard metropolitan statistical area are helpful. A study of the general characteristics of the population, and the labor force characteristics of the population indicate that almost all of the people who live in the area proposed to be annexed work in the standard metropolitan statistical area of Birmingham. A majority of them work either in downtown Birmingham or within the city limits of Birmingham. See 1970 Census of Population and Housing, Census Tracts, Birmingham, Alabama, Standard Metropolitan Statistical Area, United States Department of Commerce, Social and Economic Statistics Administration, Bureau of the Census.
Applying the principles announced in Hunter, I would find that the trial court erred in vacating the annexation. The record contains substantial evidence that the City of Birmingham did not draw its boundaries solely for the purpose of assuring favorable results in the annexation election. Consequently, in annexing the Pinson Valley territory, Birmingham made a political decision to select certain areas which it considered vital to its future plans for expansion and excluded certain areas which were either geographically unsuited for municipal regulation or the extension of municipal services, or where the residents were reluctant to be joined with Birmingham at this time.
In my opinion, courts still recognize and apply the general rule that discretionary matters involving economic or political considerations in annexation proceedings are outside judicial cognizance. See Botsford v. City of Norman, 10 Cir., 354 F.2d 491 (1965).
The majority lays much stress on the fact that "islands" or "enclaves" are established. That poses no particular problem for me. In Wilkerson v. Coralville, 8 Cir., 478 F.2d 709 (1973), residents of an unincorporated, impoverished area of a county alleged that various officials of an Iowa city had unlawfully discriminated against them in violation of 42 U.S.C.A. § 1983 by refusing to annex their area because of the poverty of its residents, and that, as a consequence, the residents had been deprived of municipal services in violation of the equal protection clause of the Fourteenth Amendment. The area in which the plaintiffs resided consisted of 119 lots owned by 31 persons, contained 11 dwelling houses and 2 trailers, had no dedicated public streets or roads, had unpaved private roads which became impassable in rain or snow, and had either inadequate or nonexistent fire protection, water and sewage facilities, street lights, sidewalks and gutters, and garbage collection. In proceedings instituted by the city, the city's voters had approved the annexation of certain territory to the city, and the territory so approved contained the unincorporated area in which the plaintiffs resided. However, the city council subsequently deleted this area from the "total annexation package," and, as subsequently approved by a state court, the area annexed to the city excluded, but completely surrounded, the area of plaintiffs' residence. Assuming, for purposes of deciding the sufficiency of the complaint on an appeal from a summary judgment dismissing the complaint in a Federal District Court, that the residents could prove that their area was excluded because of their poverty, the court said:
"From a search of the Constitution, statutes, cases, and Iowa laws, this Court cannot find the right which residents assert. We find no right of annexation available to anyone, owners or residents, regardless of economic status. Whether Coralville, in the exercise of its powers relating to the annexation of territory, should be permitted to encircle and exclude an impoverished area is a matter of legislative policy for the State of Iowa.
"The cases upon which appellants rely relate to poverty as a suspect classification when it results in the denial of the exercise of fundamental rights as in Griffin v. Illinois, 351 U.S. 12, 76 S.Ct. 585, 100 L.Ed. 891 (1955); Gideon v. Wainwright, 372 U.S. 335, 83 S.Ct. 792, 9 L.Ed.2d 799 (1963); Harper v. Virginia State Board of Elections, 383 U.S. 663, 86 S.Ct. 1079, 16 L.Ed.2d 169 (1966); Shapiro *513 v. Thompson, 394 U.S. 618, 89 S.Ct. 1322, 22 L.Ed.2d 600 (1969).
"The relative hardships endured by the residents of Summit Hills, by reason of the absence of municipal utilities, evokes concern. However, appellants' argument in the case before us is not unlike that addressed to the Supreme Court in Lindsey v. Normet, 405 U.S. 56, 92 S.Ct. 862, 31 L.Ed.2d 36 (1972), wherein the Court found the law of the State of Oregon did not violate the Equal Protection Clause. Mr. Justice White, in his opinion for the Court, said:
"`Appellants argue, however, that a more stringent standard than mere rationality should be applied both to the challenged classification and its stated purpose. They contend that the "need for decent shelter" and the "right to retain peaceful possession of one's home" are fundamental interests which are particularly important to the poor and which may be trenched upon only after the State demonstrates some superior interest. They invoke those cases holding that certain classifications based on unalterable traits such as race and lineage are inherently suspect and must be justified by some "overriding statutory purpose." They also rely on cases where classifications burdening or infringing constitutionally protected rights were required to be justified as "necessary to promote a compelling governmental interest."
"`We do not denigrate the importance of decent, safe, and sanitary housing. But the Constitution does not provide judicial remedies for every social and economic ill. We are unable to perceive in that document any constitutional guarantee of access to dwellings of a particular quality or any recognition of the right of a tenant to occupy the real property of his landlord beyond the term of his lease, without the payment of rent or otherwise contrary to the terms of the relevant agreement. Absent constitutional mandate, the assurance of adequate housing and the definition of landlord-tenant relationships are legislative, not judicial, functions.' at 73, 92 S.Ct. at 874.
"It is not the province of this Court to create substantive Constitutional rights in the name of guaranteeing equal protection of the laws. San Antonio Independent School District v. Rodriguez, 411 U.S. 1, 93 S.Ct. 1278, 36 L.Ed.2d 16 (1973)."
As I read the majority opinion, the "unlawful end" (the Gomillion test, supra) accomplished by Birmingham, here was that there were "islands" or "enclaves" which would be completely or primarily surrounded by the City of Birmingham and that "[these] people . . . were completely surrounded by the city limits of Birmingham and their only way of egress from their community would be the streets of Birmingham." Having to traverse another city's streets is not unreasonable, in my judgment. In Town of Lyons v. City of Lake Geneva, 56 Wis.2d 331, 202 N.W.2d 228 (1973), the same court which decided Fond du Lac, supra, said on this point:
"The trial court stressed the annexation was an abuse of discretion because the excluded areas could be serviced by the town only by traversing city roads to reach such town property. We do not think the fact the town must go through a city to reach another part of its town necessarily makes the annexation unreasonable. There is no showing the town would be unable to reach the property or could be prevented from reaching its property."
As I have already pointed out, census studies show many of the residents in the Pinson Valley area traverse Birmingham streets regularlya great host of them work in the city limits.
Consequently, I do not believe the fact that "islands" or "enclaves" are created is dispositive of the legal question presented. If living within an "island" or "enclave" was suspect, and if being completely surrounded by the city limits of a municipality so that the only means of egress would be over the streets of the municipality is unreasonable, *514 then Birmingham could be the first to complainit is located within a sea of smaller municipalities, and you can hardly get in or out of Birmingham without going through another city. Whether that is good or bad is a political question, in my judgment. But even assuming that what Birmingham did here constituted some social or economic ill, ". . . [T]he Constitution does not provide judicial remedies for every social and economic ill." Lindsey v. Normet, 405 U.S. 56, 92 S.Ct. 862, 31 L.Ed.2d 36 (1972), and it is not the province of this Court to create substantive constitutional rights in the name of guaranteeing equal protection of the laws. San Antonio Independent School District v. Rodriquez, 411 U.S. 1, 93 S.Ct. 1278, 36 L.Ed.2d 16 (1973).
In view of the above I would reverse the judgment of the trial court and remand the cause.
FAULKNER and SHORES, JJ., concur.
NOTES
[1] This opinion was written and circulated prior to the retirement of Merrill, J., which became effective Midnight, May 31, 1976. The case was considered in conference on May 31 but final action was postponed until June 15, 1976. Merrill, J., (retired) was recalled for service in this case by order of the Chief Justice, with the unanimous approval of the Court.