[EDITORS' NOTE: THIS PAGE CONTAINS HEADNOTES. HEADNOTES ARE NOT AN OFFICIAL PRODUCT OF THE COURT, THEREFORE THEY ARE NOT DISPLAYED.] *Page 1314 
This is an appeal from a judgment declaring unconstitutional §§ 11-42-40 through -88, Code 1975, under which the City of Birmingham attempted to annex territory, and voiding the results of the election held pursuant to those Code sections. The City of Irondale and seven individuals filed this action against the City of Birmingham and the Judge of Probate of Jefferson County. The City of Trussville intervened as a plaintiff. In addition to the constitutionality of the Code sections, the appeal presents several issues relating to the drawing of the boundaries of the annexed territory and the granting of a tax exemption to the residents.
There are three annexation articles under the "alteration of corporate limits" chapter of the title in the 1975 Code on counties and municipal corporations. Article 1, made up of §§ 11-42-1 through -4, applies to municipalities generally and provides for annexation by election. Section 11-42-2(10) states that no territory shall be included within the annexation boundary "unless there are at least two qualified electors residing . . . on each quarter of each quarter section or part thereof . . . who assent thereto in writing by signing said petition, together with the consent of the persons . . . owning at least 60 percent of the acreage." The reference to a petition is unclear, but this provision at least appears to limit annexation under Article 1 to occupied land with pre-election consent by the specified number of residents and landowners. Much of the land in the annexation at issue is unoccupied.
Another limitation on the applicability of Article 1 is that the territory to be annexed "must be contiguous to the boundary of and form a homogeneous part of the city or town," §11-42-2(10). Article 3 territory, by contrast, need only "be contiguous to the boundary of the city at some point," §11-42-42. This Court has held that this language in Article 3 allows annexation along a corridor, City of Dothan v. DaleCounty Comm'n, 295 Ala. 131, 324 So.2d 772 (1975).
Article 2 consists of §§ 11-42-21 through -23 and provides for annexation by petition of all the landowners upon approval of the petition by the city council. Beginning prior to and continuing contemporaneously with the election proceedings, Birmingham obtained petitions for annexation of much of the land in question in this case, together with some adjoining lands. Assuming the city council has accepted or may at any time accept these petitions as provided in Article 2, the validity of the annexation by petition is not in dispute in this appeal. Birmingham does not have petitions for annexation of certain significant parcels included within the election territory, however, so the case is not moot. *Page 1315 
Article 3 (§§ 11-42-40 through -88) was declared unconstitutional in its entirety by the trial court. It allows for annexation b election by cities of 25,000 inhabitants or more. The portion deemed unconstitutional is found in §11-42-73:
 "no person residing on territory which is exempt from taxation under provisions of this article shall have any right to vote in any election held in the city for the election of any city officer or in any other election held in the city which pertains to the government of said city, but [sic] no person who resides in territory exempt from taxation under the provisions of this article shall be eligible to hold any elective office in said city. . . ."
The City of Birmingham concedes that this provision (hereinafter "the voting limitation") is unconstitutional underHarper v. Virginia State Board of Elections, 383 U.S. 663,86 S.Ct. 1079, 16 L.Ed.2d 169 (1966), but argues that the provision is severable and that, at least since Harper was decided, it has not attempted to enforce the provision in territory it has annexed under Article 3 and would never attempt to do so. The trial court, however, held that the voting limitation is not severable.
The Article 3 annexation method has been the law of this state for 80 years and has been used for annexations in many instances, and there is no indication that the voting limitation has ever been applied. See City of Birmingham v.Mead Corp., 372 So.2d 825 (Ala. 1979); Washington v. City ofBirmingham, 364 So.2d 1151 (Ala. 1978); and City of Dothan v.Dale County Comm'n, supra. Considering the limited applicability of Articles 1 and 2, an affirmance in this case would result in there being many instances of cities having no effective procedure for annexation.
Birmingham first argues that the plaintiffs do not have standing to challenge the constitutionality of the voting limitation because there has been no attempt to enforce it against them. The major contention of the plaintiffs, however, is that Article 3 as a whole is unconstitutional because the voting limitation is so interrelated with the other provisions of Article 3 that it is inseverable, i.e., that the entire article can neither stand nor be enforced consistently with the legislative intent without the voting limitation being enforced. Four of the individual plaintiffs live within the annexed area, and plans by the Cities of Irondale and Trussville to annex to each other's borders are substantially affected by the annexation. Given the argument of inseverability, Birmingham's use of Article 3 to effect the annexation gives the plaintiffs standing to bring this suit.
If a portion of a legislative enactment is determined to be unconstitutional but the remainder is found to be enforceable without it, a court may strike the offending portion and leave the remainder intact and in force. Courts will strive to uphold acts of the legislature. The inclusion of a severability clause is a clear statement of legislative intent to that effect, but the absence of such a clause does not necessarily indicate the lack of such an intent or require a holding of inseverability. See, e.g., Hamilton v. Autauga County, 289 Ala. 419,268 So.2d 30 (1972); Wilkins v. Woolf, 281 Ala. 693, 208 So.2d 74 (1968); Singer, Sutherland Statutory Construction, § 44.09 (4th ed. 1986).
Article 3 does not include a severability clause. Article 3 is the current codification of Act 677, 1907 Ala. Acts. Contrary to having a severability clause, Act 677 included the "contract clause" now found at § 11-42-88, which reads:
 "(a) The provisions of this article shall be held to be a contract by and between the city and persons or corporations owning property in the territory exempt from taxation under the provisions of this article and no amendment hereof or subsequent law shall confer upon the city other or different rights and powers as to such territory as is exempt from taxation so long as such territory remains exempt from taxation under the provisions of this article.
 "(b) Any person residing in or owning property in the territory exempt from taxation under the provisions of this article shall have the right in any court *Page 1316 
having jurisdiction to prevent the city from exercising any other or different powers in the territory exempt from taxation or any part thereof than the powers authorized under the provisions of this article."
A fair reading of the whole of this section indicates that it was intended to prevent a city from usurping "other or different rights and powers" and to give residents the right to enforce the rights granted to them in Article 3. Under this reading, § -88 did not necessarily preclude a city from extending services or the right to vote. However, because the language in § -88 refers to the provisions of the article as being a contract between the city and persons owning property in the tax-exempt territory, we must address the question of whether § -88 prevents the voting limitation from being severable from the remainder of Article 3.
Although the 1907 legislature may have intended the voting limitation to be included among the rights given up in exchange for the tax exemption, that legislature could not have expected that such a condition on voting would be deemed unconstitutional. Indeed, the Alabama Constitution of 1901, only recently enacted at the time, included a poll tax as a requirement for voting. Furthermore, the United States Supreme Court upheld poll tax requirements for voting — see Breedlovev. Suttles, 302 U.S. 277, 58 S.Ct. 205, 82 L.Ed. 252 (1937), and Butler v. Thompson, 341 U.S. 937, 71 S.Ct. 1002,95 L.Ed. 1365 (1951) — until the reversal of that principle in Harper.
Thus, the legislature in 1907 and even in 1940, when the last previous Code was adopted, could have considered the right to vote as an unremarkable item in a list of rights which new city residents did not obtain until their tax exemption expired.
The 1977 legislature readopted the provisions of Act 677 as Article 3 of title 11, chapter 42, of the 1975 Code. Act 20, 1977 Ala. Acts. By making these provisions part of the 1975 Code, the 1977 legislature made them subject to the following provision of § 1-1-16:
 "If any provision of this Code or any amendment hereto, or any other statute, or the application thereof to any person, thing or circumstances, is held invalid by a court of competent jurisdiction, such invalidity shall not affect the provisions or application of this Code or such amendment or statute that can be given effect without the invalid provisions or application, and to this end, the provisions of this Code and such amendments and statutes are declared to be severable."
A legislature is not to be presumed to have done a futile thing. To reenact Act 677 in 1977 with the indisputably unconstitutional voting limitation as a necessary, inseparable portion would have been futile. A broad look at Article 3 shows only a procedure for annexation elections with provisions for tax exemptions and reductions of city services. Buried in one section, which in the 1940 Code (t. 37, § 169) bore the heading "Wards created; aldermen and councilmen provided for," and which bears a similar heading in the 1975 Code, is a provision disfranchising residents of tax-exempt annexed areas and prohibiting them from holding city office. This textually minor provision should not be considered a substantively major one unless compelling considerations make it so.
Therefore, even if the contract provision in § -88 makes the voting limitation a part of a unified scheme, the above considerations compel us to consider whether the voting limitation is such a necessary part of the statutory scheme that its exclusion makes the whole unintelligible or unenforceable or impossible to apply.
To consider the place of the voting limitation in the statute as a whole, it is necessary to have a general idea of the plan of the statute. The following is a rough classification of the individual sections of Article 3, omitting the title and chapter portions of the section numbers:
i. applicability of the article (40)
ii. election procedures (41-56)
iii. tax exemption provisions (57-62) *Page 1317 
iv. contests of termination of exemption (63-70)
 v. termination of exemption entered on probate records (71)
vi. jurisdiction of city over territory (72)
vii. elections, apportionment, and voting (73-75)
 viii. reduced city services during exemption (76-85)
 ix. acquisition of rights by relinquishment of exemption (86)
x. fees for probate judge (87)
 xi. provisions a contract; citizens may enforce (88)
The grant of the exemption is balanced by the provision of reduced city services, which takes up much more of the statute and is commensurably more prominent in the scheme than the voting limitation, which is only a small part of the seventh group of sections. That group, providing for apportionment and elections, is fully understandable and capable of implementation without the voting limitation.
Section 76 generally provides:
 "No person residing in territory exempt from taxation in the city shall be entitled to receive any of the benefits derived from taxes paid to the city; except, that as far as practicable it shall be the duty of the city to give police and fire protection to persons and property in the exempt district."
This section alone provides a reasonable balance to the tax exemption and gives substance to the legislative intent in § -88 that the provisions of the article shall be a contract between the city and the residents and property owners of exempt territory. Moreover, the article goes even further in counterbalancing the detriment to the city of the tax exemption by limiting construction of improvements, § -77, with exceptions for sanitary sewers, § -78, and sidewalks and curbing, § -79. A street tax is allowed by § -80, with the proceeds to go to streets in the exempt territory. Dance halls, poolrooms, and businesses "of like kind or character" may not be licensed, § -8,[1] and license or privilege taxes may be imposed only under the limitations in §§ -82 through -84. The city may fix a per capita tuition for students in city schools to offset the portion of the school budget which would normally be supplied by city taxes, § -85.
All of these provisions constitute an easily comprehensible plan of giving residents an incentive to vote in favor of annexation by deferring the imposition of city taxes for some years, while decreasing the burden on the city of providing services. In addition to these provisions for limited economic participation in city services by residents of newly annexed territory, the statutory scheme as enacted includes the further provision for limited political participation in city government. This unconstitutional political limitation is not central to the scheme, however, and we hold that it is severable and that the remainder of Article 3 may be implemented with the voting limitation excised.
The trial court found that the tax exemption was a material inducement to the residents to vote in favor of annexation, and that the voting limitation was inextricably linked to the tax exemption. Aside from our holding that the voting limitation is severable, we point out that the trial court's finding of a "material inducement" and an "inextricably link" results from a misapplication of the test applied in City of Mobile v.Salter, 287 Ala. 660, 255 So.2d 5 (1971); A. Bertolla Sons v.State, 247 Ala. 269, 24 So.2d 23 (1945); and Union Bank TrustCo. v. Blan, 229 Ala. 180, 155 So. 612 (1934). The test is not whether the voters would vote in favor of annexation without the tax exemption, but whether the legislature would have passed the statute without the voting limitation. Consonant with our holding on severability, we hold that the likelihood that the legislature would have passed the statute without the voting limitation is great enough that the statute as a whole should be upheld.
The trial court also referred to § -86, the provision by which landowners *Page 1318 
may waive the tax exemption and acquire full rights and privileges as city residents, as being unconstitutional. This provision makes no explicit reference to voting and office-holding, and it is unobjectionable as a means by which the landowners may choose to acquire full city services. Therefore, with the voting limitation severed, nothing in § -86 is unconstitutional.
The trial court further discounted Birmingham's assertions that it would not enforce the voting limitation, "because, among other reasons, 'The constitutional validity of a statute is to be tested, not by what has been done under it, but by what, by its provisions, rightfully may be done.' Town ofSamson v. Perry, 17 F.2d 1, 2 (5th Cir. 1927)." Birmingham's disclaimer of the voting limitation was not offered to show the constitutionality of that provision, however, but to show its severability and the constitutionality of Article 3 without the voting limitation. In this respect the disclaimer is relevant and pertinent. Indeed, under our holding in this case, all cities in this state are prohibited from attempting to enforce the voting limitation which has now been stricken from Article 3.
Plaintiffs argued, and the trial court accepted, four other challenges to the annexation at issue based on its facts: (1) that the drawing of the boundaries of the territory constituted gerrymandering so as to violate plaintiffs' right to equal protection of the laws; (2) that the drawing of the boundaries violated the rule of reasonableness; (3) that the tax exemption granted by Birmingham exceeded that authorized by Article 3; and (4) that the legal description of the territory to be annexed was inadequate or inaccurate. The trial court also awarded attorney fees to plaintiffs pursuant to 42 U.S.C. § 1988.
Regarding the gerrymandering issue, we think it appropriate to set forth some of the facts concerning this case. The City of Birmingham, the largest city in the state, is surrounded by more than 23 incorporated municipalities within Jefferson County. Many of these are adjacent to the Birmingham city limits and are contiguous to each other, leaving only a few gaps through which Birmingham can expand. This annexation is an attempt to expand through one such gap. Irondale adjoins Birmingham on the east, and the City of Leeds lies about two miles east of Irondale. The general route of this annexation is from the Birmingham border north of Irondale to the east and then south between Irondale and Leeds. The territory continues a good distance to the south and then turns back west.
Birmingham recently annexed property to the north of Irondale, including the site of the new horse racing track. SeePhalen v. Birmingham Racing Comm'n, 481 So.2d 1108 (Ala. 1985). The territory at issue in this case adjoins Birmingham at the southern and eastern borders of that annexation. The portion to the south lies between the horse track annexation boundary and the northern city limits of Irondale; this area includes the communities of Brownlee Hills and Liberty Highlands. To the east, the territory proceeds to the western edge of Interstate Highway I-459. At the northernmost reach of the territory it turns eastward to cross I-459, proceeds above[2] the northern border of the unincorporated community of Alton, and turns southward. The result is that Alton is surrounded on the west, north, and east by Birmingham, with the opening to the south consisting primarily, if not entirely, of the I-459 right-of-way corridor.[3] *Page 1319 
The plaintiffs argue, and the trial court held, that Birmingham violated the Equal Protection Clause of the Fourteenth Amendment to the United States Constitution by drawing the annexation boundaries to include Brownlee Hills and Liberty Highlands but to exclude Alton and other communities adjacent to the territory as it proceeded southward. This argument relies largely on City of Birmingham v. Community FireDistrict, 336 So.2d 502 (Ala. 1976). This Court in CommunityFire District, citing Kramer v. Union Free School District No.
15, 395 U.S. 621, 89 S.Ct. 1886, 23 L.Ed.2d 583 (1969), stated:
 "When an election is to be held, absent a compelling state interest (the strict test of equal protection), qualified voters may not be excluded unless their stake in the outcome is substantially smaller than the stake of those allowed to vote."
336 So.2d at 505. (Emphasis in Community Fire District.)
Community Fire District presented a different situation from the instant case, however, as can be seen from the language setting forth its holding:
 "The facts in this case show rank discrimination. People living on the same street and in the same
block have the same interests, but those who were against annexation were not allowed to register their choice because they were excluded from voting by the arrangement of the boundary lines.
". . .
 "Here, the only reason Birmingham excluded these islands or enclaves of population was that they knew that the people in the islands would vote 'No.' "
Id., at 505-06 (emphasis in original). In the instant case, Birmingham did not surround small pockets of citizens because it knew they would vote against the election; it bypassed whole communities and left them completely outside the city limits either because it had had no indication that they wished to be brought into the city or, in the case of Alton, because the residents had expressed a desire to be brought into the City of Irondale.
Because City of Tuskegee v. Lacey, 486 So.2d 393 (Ala. 1985), was overruled in City of Fultondale v. City of Birmingham,507 So.2d 489 (Ala. 1987) (rejecting the public-right-of-way "long lasso" method, but reaffirming "corridor" annexation), it is no longer true that Alton can use the I-459 corridor to be annexed into Irondale. That fact does not make Birmingham's encirclement of Alton a violation of the Alton residents' equal protection rights by denying them the right to vote in the annexation election. For one thing, Alton was not made an island or enclave under the law as it existed when the election was declared and held. For another thing, Alton is a sizeable, homogeneous community which has been left as such, whereas the citizens whose right to vote was denied in Community FireDistrict were residents of parcels, in some cases smaller than a city block, which were completely surrounded in a checkerboard pattern of excluding potential anti-annexation voters.
It is not necessary for Birmingham to give the right to vote to persons outside its city limits. Holt Civic Club v. City ofTuscaloosa, 439 U.S. 60, 99 S.Ct. 383, 58 L.Ed.2d 292 (1978). Birmingham has an articulated "open door" policy by which it admits those communities which express an interest in coming into the city but normally does not bring in residential communities if they do not request to be brought in. It followed that policy in this case. The drawing of the boundaries of the annexation territory did not violate the constitutional rights of those who were left outside; indeed, they wanted to be outside, as is apparent from the fact that their whole argument is based on their right to vote that preference.
Gomillion v. Lightfoot, 364 U.S. 339, 81 S.Ct. 125,5 L.Ed.2d 110 (1960), is distinguishable if only in that it involved the deannexation of portions of the City of Tuskegee and thereby the disfranchisement of residents of certain portions of the city for no reason other than the fact that the population of those portions was primarily black. As in other cases cited by the trial court and the plaintiffs, the deprivation of the right to vote in Gomillion *Page 1320 
concerned people within the political subdivision. See Harperv. Virginia State Bd. of Elections, 383 U.S. 663,86 S.Ct. 1079, 16 L.Ed.2d 169 (1966); Carrington v. Rash, 380 U.S. 89,85 S.Ct. 775, 13 L.Ed.2d 675 (1965); Dunn v. Blumstein,405 U.S. 330, 92 S.Ct. 995, 31 L.Ed.2d 274 (1972); Evans v.Cornman, 398 U.S. 419, 90 S.Ct. 1752, 26 L.Ed.2d 370 (1970).
A further argument made by the plaintiffs but not relied on by the trial court is that the residents of the southern portion of the annexed territory were deprived of an effective vote because their sparsely settled residential areas were coupled with the distant and more densely populated areas of Liberty Highlands and Brownlee Hills, as to which Birmingham knew that a majority of the residents wished to be annexed. Plaintiffs cite the proposition of Reynolds v. Sims,377 U.S. 533, 555, 84 S.Ct. 1362, 1378, 12 L.Ed.2d 506 (1964), that "the right of suffrage can be denied by a debasement or dilution of the weight of a citizen's vote just as effectively as by wholly prohibiting the free exercise of the franchise." See, also,Baker v. Carr, 369 U.S. 186, 82 S.Ct. 691, 7 L.Ed.2d 663
(1962); Rogers v. Lodge, 458 U.S. 613, 102 S.Ct. 3272,73 L.Ed.2d 1012 (1982); Busbee v. Smith, 549 F. Supp. 494 (D.D.C. 1982), affirmed, 459 U.S. 1166, 103 S.Ct. 809, 74 L.Ed.2d 1010
(1983).
Resolution of this issue requires setting forth further facts. After the annexation territory turns south on the east side of Alton, it incorporates some sizeable tracts, including most of two government survey sections, whose owners had petitioned to come into Birmingham. These tracts lie between Irondale and Leeds on the north side of U.S. Highway 78 and Interstate Highway I-20. The territory crosses Highway 78 and I-20 in a narrow strip and then follows the Cahaba River, incorporating a path approximately 1000 to 2000 feet wide, southward through four different sections, until the river turns west and north. Birmingham had petitions from some of the landowners in this area.
After the river turns west, the annexation territory follows a corridor the width of a quarter-quarter section and the length of two sections until it reaches the Lake Purdy reservoir, which is owned by the Birmingham Water Works Board. Birmingham had petitions from the Water Works Board for this property to come into the city. The annexation of this area, together with the Cahaba River area described above, was a principal purpose of this entire annexation effort. The river and the lake are important elements of Birmingham's water supply, and the lake has potential for recreational development and thus for both city recreational use and additional tax base for the city.
Considerable portions of the Lake Purdy area included in the annexation territory were covered by petitions, but some other portions were not. The annexation territory proceeded to the west, crossing some areas where Birmingham again had petitions from property owners, until it reached the intersection of 1-459 and U.S. Highway 280. Annexation of the major commercial and office building development at this intersection was another prime purpose of this annexation effort.
Prior to calling the annexation election under the provisions of Article 3 of title 11, chapter 42, Birmingham was attempting to annex the properties in question by the petition method of Article 2. At the same time, Irondale was conducting a petition drive in Alton, and there is evidence that Irondale and Leeds were planning to annex to each other's borders so as to block Birmingham's expansion to the south. Upon learning this, Birmingham hastily called the election in question, largely following the property lines of petitions it had in hand. It had petitions from some, but not all, of the property owners in Brownlee Hills and Liberty Highlands, and it did not have petitions sufficient to establish contiguity to Lake Purdy, especially in the Cahaba River area (though it later obtained some petitions there) and the corridor immediately to the south.
North of Highway 78 and south of Alton is Goat Mountain Road. Plaintiffs cite figures from the probate court record of the annexation election indicating that the vote *Page 1321 
north of Goat Mountain Road was 118 in favor of annexation and 14 against, while south of Goat Mountain Road the vote was 11 in favor and 44 against. It is these figures which plaintiffs, some of whom apparently live in the annexation territory south of Goat Mountain Road, cite in support of their argument that the votes of those in the southern portion of the territory were diluted by the votes of those in the northern portion.
The simple answer to this argument is that the cases on which plaintiffs rely involve the election of representatives to legislative bodies from distinctly apportioned districts. The Court in Reynolds v. Sims, supra, held that
 "the Equal Protection Clause requires that the seats in both houses of a bicameral state legislature must be apportioned on a population basis. Simply stated, an individual's right to vote for state legislators is unconstitutionally impaired when its weight is in a substantial fashion diluted when compared with votes of citizens living in other parts of the State."
Id., 377 U.S. at 568, 84 S.Ct. 1362.
Because this case does not involve the right to participate in representative government, which is "preservative of all rights," Yick Wo v. Hopkins, 118 U.S. 356, 370, 6 S.Ct. 1064,1071, 30 L.Ed. 220 (1886), we question whether it requires as strict a scrutiny as other voting rights cases or whether the principle of dilution of votes applies. Even assuming the affirmative in both cases, however, we find that there has been no violation of the Equal Protection Clause here.
In calling an annexation election, the city does not divide the territory into districts. Article 3 contemplates annexation of industrial and mining properties as well as residential properties, § 11-42-59, and that "Land owned by any number of separate and distinct owners may be embraced in the same resolution" terminating the tax exemption, § 11-42-62. To hold in plaintiffs' favor on this issue would require a city to annex in incremental steps, annexing only small homogeneous communities or areas at each step. As the law stands, the whole territory is either annexed or not depending on the vote over the whole territory. Certainly if a city has legitimate objectives in including various parcels in annexation territories it does not unconstitutionally dilute the votes of the residents of the less populous areas so long as it draws the boundaries reasonably and not arbitrarily.
The foregoing statement shows that the vote dilution issue, if it provides a real issue at all, is little different from the reasonableness issue that is the other prong of theCommunity Fire District case, cited supra. Considering the facts set forth in previous sections of this opinion, as well as other evidence of record, we hold that the annexation in question did not violate the rule of reasonableness. City boundaries and territories annexed thereto do not have to be regular in shape. City of Dothan v. Dale County Comm'n,295 Ala. 131, 324 So.2d 772 (1975). Indeed, as explained at the beginning of this opinion, the corridor method of annexation is one of the principal differences between Article 1 and Article 3, both of which were enacted by the 1907 legislature. Birmingham's decisions to include and exclude residential communities were reasonably based on consideration of the wishes of the residents. Each of the areas annexed was included in furtherance of a legitimate municipal objective: admission of community residents who desired city services, protection of sources of city water supply, and protection of the city's tax base by expansion to outlying areas which benefit from the metropolitan community centered around Birmingham but which have eroded that tax base by the movement of commerce into and beyond the ring of suburban incorporated municipalities surrounding the central city.
The trial court also voided the annexation election on the ground that Birmingham exceeded the provisions of Article 3 when it granted a 15-year tax exemption to the residents of the annexed territory. Section 11-42-57 reads: *Page 1322 
 "All territory brought within the corporate limits of a city under the provisions of this article and all property having a situs within such territory shall be exempt from city taxation or the payment of taxes to the city for the period of not less than 10 nor more than 15 years from the time when such territory is brought within the corporate limits of the city, which period of exemption shall be fixed in the resolution passed by the council or governing body of the city authorized under the provisions of section 11-42-41, except as provided in sections 11-42-58 and 11-42-59."
The trial court, without referring to the above section, quoted § 11-42-58, omitting the first four words:
 "From time to time after the lapse of five years from the time when such territory is brought within the corporate limits of the city, all portions of such territory as has residing on it [sic] a population of at least 20 persons on a contiguous 10 acres of land (in form of a square or any other shape) and all property having a situs on such populated territory shall thereafter be subject to taxation by the city and taxes thereon shall be paid to the city."
Section 11-42-60 provides that the city "shall pass a resolution" declaring territory subject to taxation "[w]henever and as often as the facts exist which authorize a city to collect taxes." Section 11-42-63 allows a property owner to file a contest
 "contesting the right of the city to tax any of the land or property owned by him, assigning as grounds for such contest the nonexistence of some one or more of facts required by this article to be in existence before the property is subject to city taxation."
The "from time to time" language in § 11-42-58 and the provisions of § 11-42-60 require the city to make the determination and declare, at any time after five years but before the territory-wide exemption of 10 to 15 years expires, that parcels fitting the description in § 11-42-58 are subject to taxation. Section 11-42-63 and those following give the right to contest such declarations. Therefore, the expiration of the tax exemption after five years is not automatic, and the failure to set these provisions forth in the resolution does not void the annexation. We do not read the final clause of §11-42-57 as modifying the clause stating that the "period of exemption shall be fixed in the resolution," but as modifying the clause providing that all territory shall be exempt from city taxes for "not less than 10 nor more than 15 years."
Ramer v. City of Hoover, 437 So.2d 455 (Ala. 1983), is distinguishable in that it involved a contract whereby the city proposed to bind itself to certain limitations on taxation for 15 years. Even though that provision was held to be void, it was held severable and its inclusion not sufficient to void the election. Similarly, the only residents of the annexed territory who lived on property fitting the description in §11-42-58 at the time of the election were those in Liberty Highlands and Brownlee Hills, and they approached Birmingham city officials requesting annexation before any representations about tax exemptions were made. Therefore, no reliance on a mistaken statement that the tax exemption would last 15 years affected the annexation election, so no such statements provide cause to void the election.
Finally, the trial court held that variances between the descriptions of the annexed territory and the map of the territory on file at the probate court were cause to void the election. Section 11-42-42 requires the mayor to certify to the probate judge a copy of the resolution calling the annexation election, together with a plat or map showing the boundary of the territory proposed to be annexed. Section 11-42-44 requires the probate judge to give notice of the election and provides that
 "such notice must give a description of the territory proposed to be brought within the city and must state that a map showing the territory proposed to be brought into the city is on file in the office of the judge of probate of said county, open to the inspection of the public." *Page 1323 
Birmingham filed a map and provided the probate court with a description which it gave in its notice of the election. Birmingham again filed a description after the election. Several small areas were included on the map but not in the descriptions, and vice versa. Birmingham indicated at trial that it intended the map to govern, and its expert witnesses who testified regarding surveying practices indicated that under the circumstances a surveyor would follow the map rather than the description.
This Court held in City of Birmingham v. Mead Corp.,372 So.2d 825 (Ala. 1979), that the standard to be applied is that substantial accuracy, not perfection, is all that is required in an annexation description, and that an ambiguity in the property description will not void the election if a surveyor can locate the property on the ground. Although two of the plaintiffs testified that they did not know whether they lived in the annexation territory or not, it appears from their testimony that they did not even try to find out. The discrepancies between the map and the notices were insubstantial and do not serve to void the election.
Because we reverse the trial court's holding in favor of the plaintiffs, the award of attorney fees cannot stand.
For the foregoing reasons, the judgment is reversed and the cause remanded. The trial court is directed to enter a judgment declaring the annexation valid.
REVERSED AND REMANDED.
MADDOX, JONES, ALMON, SHORES, BEATTY and ADAMS, JJ., concur.
TORBERT, C.J., and HOUSTON, J., concur in the result.
[1] Perhaps because such establishments tend to require greater police protection.
[2] One of the maps included as exhibits in this case makes it appear that the annexed territory crosses the northern portion of Alton rather than passing entirely to the north of Alton. The parties discuss the territory as avoiding Alton altogether, so we treat the facts in that manner.
[3] Plaintiffs claim that Alton was encircled because Birmingham annexed to the right-of-way on the west and again on the east. The map and all other evidence shows the highway and its right-of-way as not being annexed. Just because a city can annex across a right-of-way, City of Leeds v. Town of Moody,294 Ala. 496, 319 So.2d 242 (1975), does not mean that an annexation to a right-of-way necessarily includes the right-of-way.