These consolidated appeals are from a judgment declaring null and void an August 13, 1985, annexation election called for by the City of Birmingham, and they involve a question of the validity of the so-called "corridor" principle. We reverse and remand.
Pursuant to §§ 11-42-40 through -88, Code of 1975, Birmingham passed a resolution calling for an annexation election to annex certain unincorporated territory in western Jefferson County. This resolution, as later amended, along with a map of the territory proposed to be annexed, was filed with the probate court, which ordered the election to be held on August 13, 1985. Prior to the election, certain residents of, and property owners in, the proposed annexation area (individual appellees/cross-appellants) filed a declaratory judgment action in the Circuit Court of Jefferson County, in which they sought a declaration concerning the constitutionality of §§ 11-42-40
through -88. They also sought to enjoin the holding of the annexation election to be held on August 13, 1985, and to enjoin the certification of the election results. Both Birmingham and a judge of the probate court of Jefferson County were named as defendants (appellants/cross-appellees). The circuit court refused to enjoin the holding of the election, but it did issue an order enjoining the probate judge from certifying the results. A majority of the qualified voters in the proposed territory voted for the annexation in the election. Subsequently, both the City of Hueytown and the Jefferson County Board of Education were allowed to intervene as plaintiffs in the action.
Following a two-day, non-jury trial, the court entered a lengthy order declaring the election null and void. In its order, the trial court succinctly described the property Birmingham sought to annex. None of the parties takes issue with the correctness of this description, nor with any of the factual findings made by the trial judge. The order reads, as follows:
 "The territory subject to the election . . . consists of two areas, referred to as Port Birmingham and Dolomite, which are connected (by Birmingham's resolution) to each other and to Birmingham by corridors. The first corridor is contiguous to the corporate limits of Birmingham, where these limits end just east of the town of Sylvan Springs. It then runs generally south along the western limits of the city of Pleasant Grove and then east along the southern limits of Pleasant Grove to Dolomite. For the most part, this corridor is a quarter of a mile wide and has a length of about five to six miles. The second corridor is 200 feet wide. It begins at about the midway point of the first corridor and runs generally westward until it reaches the Rock Creek-Alliance Road and then north to the Port Birmingham area. It is approximately ten to eleven miles long. This corridor crosses land, ninety percent of which is owned or leased by Drummond Coal Company and Alabama By-Products Corporation. There are no residents in this corridor. The only residents in the first corridor are those living along Forest Road as the corridor nears the Dolomite area. A preliminary voters count done by Birmingham prior to the election showed over one thousand registered voters in the Dolomite area and fifteen in the Port Birmingham area.
 "The area known as Dolomite involves two sections of land located generally between the cities of Hueytown and Pleasant Grove. It is primarily residential. The area known as Port Birmingham involves 13-14 sections of land along the Locust Fork of the Warrior *Page 587 
River. It is rural, agricultural, and woodlands with some industrial development, primarily docks used for barge transportation of coal and some petroleum and steel products."
The trial court further held, inter alia:
(1) That Code of 1975, § 11-42-73(b), was unconstitutional in that it provided that residents of an annexation area which is tax exempt cannot vote in city elections, at least as long as the residential area remains tax exempt, citing Harper v.Virginia State Board of Electors, 383 U.S. 663, 86 S.Ct. 1079,16 L.Ed.2d 169 (1966), in support of its holding. It, however, found this invalid section to be severable from the other valid sections of the Act (§§ 11-42-40 through -88);
(2) That Birmingham had abused its discretion when it sought to combine two dissimilar areas in the annexation election territory by using a "corridor." The court reasoned:
 "What Birmingham has done in including this territory for one annexation is to combine two completely dissimilar areas. One is rural with few residents, but has a potential for industrial development by the fact that it lies along a navigable waterway. The other is almost exclusively a residential area, which will bring into the city an insufficient amount of revenue to cover the cost of services the city will have to provide to it after the tax exemption has expired. The two areas bear no reasonable relationship to each other in land use, population density, topography, or location. They are only related in that Birmingham has joined them together, by corridors for this election."
The court recognized that:
 "Birmingham has long desired to annex the Birmingport area for industrial development, which is a legitimate municipal purpose and one which, according to the feasibility study conducted by the Birmingham Regional Planning Commission should provide jobs and increased land values in the area."
The trial court further found that this design "was based upon Birmingham's apprehension that an election of Port Birmingham would fail and its anticipation that one which combined both areas (the Dolomite area having a 66-to-1 voting superiority) would succeed," and that Birmingham's real purpose was to insure the success of the election. It held:
 "The practical effect of the design of these boundaries is that Birmingham has allowed the voters in Dolomite not only to determine their destiny, but also the destiny of the voters in Port Birmingham. That the votes cast at Powhatan would be of no import in the final outcome was a foregone conclusion. The Court finds that the combining of these two areas is not a reasonable exercise of the city's authority and that the city abused the discretion granted to it by the legislature in determining the boundaries of this election. City of Tuskegee v. Lacey, [486 So.2d 393] (Ala. 1985); City of Birmingham v. Mead Corp., 372 So.2d 825 (Ala. 1979); Washington v. City of Birmingham, 354 [364] So.2d 1151 (Ala. 1978); City of Birmingham v. Community Fire District, 336 So.2d 502 (Ala. 1976)."
The Court also found that Birmingham had eliminated some areas because of expressed opposition to annexation, and the court held that this action was constitutionally impermissible. The Court stated:
 "After the first resolution of July 9, Birmingham eliminated several areas from the annexation territory. The majority of these were for the purpose of deleting areas that the city found to be unsuitable for industrial development. Others, however, were eliminated because of expressed opposition to annexation. Eliminating areas because they do not suit a legitimate municipal purpose is permissible, but to exclude voters because of the way they vote is constitutionally infirm. Carrington v. Rash, 380 U.S. 89
[85 S.Ct. 775, 13 L.Ed.2d 675] (1965). As municipal corporations are political subdivisions of the state, then their actions are 'state actions' and, therefore, subject to the strict constraints of the equal protection clause of the Fourteenth Amendment. *Page 588 Avery v. Midland County, 390 U.S. 474
[88 S.Ct. 1114, 20 L.Ed.2d 45] (1968)."
(3) That a certain agreement between Birmingham and two coal mining companies (Drummond Coal Company and Alabama By-Products Corporation) was illegal:
 "This agreement was made by Birmingham and the companies sometime after the first annexation resolution and before the second. It provides, inter alia, that 'Any unoccupied portion of the 200 [-foot] corridor extending from the Warrior River to Section 12, Township 18 South, Range 5 West, shall be moved at any time in the judgment of the mining companies it affects mining operations of the mining corporations, provided a petition for a substitute corridor through unoccupied territory is presented to the city for an alternative corridor to maintain contiguity of the annexed territory.' The city did not reserve any authority to approve or deny the substitute corridor. Therefore, before the final resolution calling for the election was passed, Birmingham had already delegated to the coal companies the power to amend the boundaries of the area subject to the annexation. A municipality cannot by any provision or terms in a contract delegate or barter away a governmental power. City of Leeds v. Town of Moody, 319 So.2d 242, 294 Ala. 496 (1975)."
 I
In light of the above findings, the circuit court declared the August 13, 1985, election null and void and ordered the probate judge of Jefferson County not to certify the results. These appeals followed.
In its appeal, Birmingham raises four issues, three having to do with the trial court's finding that Birmingham abused its discretion, thereby violating (1) the rule of reasonableness and (2) the constitutional rights of the interested, yet excluded, voters in determining the boundaries of this annexation election. The fourth issue concerns the correctness of the trial court's holding that the annexation agreement between Birmingham and Alabama By-Products Corporation and Drummond Company, Inc., was illegal and thus rendered the election invalid.
Appellees/cross-appellants raise only one issue: whether the trial court erred when it found that the unconstitutional annexation provisions, §§ 11-42-73 and -86, were severable from the rest of the annexation act.
After considering the briefs of the parties, the oral arguments of counsel, and the facts involved, we are of the opinion that the judgment of the trial court is due to be reversed on the appeal by Birmingham, insofar as it declared the election null and void and ordered the probate judge not to certify the results, but that the ruling complained of on the cross-appeal (the severability issue) is due to be affirmed.
 II
We first address the cross-appeal. In City of Birmingham v.Smith, 507 So.2d 1312 (Ala. 1987), this Court held that the voting limitation provision, § 11-42-73, is severable from the remaining portions of the annexation act. As for § 11-42-86, we held that "[t]his provision makes no explicit reference to voting and office-holding, and it is unobjectionable as a means by which the landowners may choose to acquire full city services. Therefore, with the voting limitation severed, nothing in § 86 is unconstitutional." 507 So.2d at 1318. We, therefore, affirm the trial court's ruling on the severability issue.
 III
We now consider the merits of the consolidated appeals. As pointed out earlier, these appeals involve the use of a "corridor" to establish contiguity.
In a recent annexation case, City of Fultondale v. City ofBirmingham, 507 So.2d 489 (Ala. 1987), this Court was faced with facts necessitating a reexamination of the cases dealing with the so-called "corridor" method of annexation: City ofTuskegee v. Lacey, 486 So.2d 393 (Ala. 1985), and City ofDothan v. Dale County Comm'n, 295 Ala. 131, 324 So.2d 772
(1975). In City of *Page 589 Fultondale, a majority of this Court overruled City ofTuskegee, but reaffirmed the holding in City of Dothan. We are of the opinion that the holding in City of Dothan is controlling here on the "corridor" question.
In City of Dothan, under the same statutory authority under which Birmingham acted in the present case, Dothan sought to annex a 350-foot land corridor contiguous to the Dothan corporate limits, together with a parcel of land contiguous to that corridor that included the Dothan Municipal Airport property.
In City of Dothan, this Court discussed both the requirement of "contiguity" and the principle of homogeneity with the rest of the city, which we discuss later, and held as follows:
 "A. The requirement of Tit. 37, § 152 [now § 11-42-42(b)] is simply that the territory proposed to be annexed be 'contiguous to the boundary of the city at some point.' [Our emphasis.] The map and legal description accompanying Dothan's resolution shows that there is approximately a 350-foot common boundary between the territory proposed to be annexed and the city boundary. This, we hold, is ample satisfaction of the requirement of 'contiguity' under § 152, supra.
 "There is no requirement of 'substantial common boundary' as the Probate Court seems to consider necessary. In the terms of this statute, 'contiguity' means a 'touching' at some point. State ex rel. Milan v. Masters, 207 Ala. 324, 93 So. 14 (1922).
 "B. By the express terms of § 152, Code, the property proposed to be annexed 'may extend to or around the boundary line of any other city, but is not to embrace any territory within the corporate limits of another city.' . . . It is self-evident that there is a clear distinction between 'corporate limits' and 'police jurisdiction.' See Tit. 37, § 9, Code of Alabama 1940 for a definition of the latter term.
 "It would seem that had the legislature determined to exclude territory within the police jurisdiction of one city from being annexed by another, it would have been a simple matter to have so provided. Such was the legislative purpose as expressed in Tit. 37, § 137(1) [another annexation statute] wherein it is expressly provided that property to be annexed within that provision 'not lie within the corporate limits or police jurisdiction of any other mnicipality.' See our recent decision, State ex rel. City of Birmingham v. Tarrant City, 294 Ala. 304, 315 So.2d 583 (1975), construing this section. There, this Court suggested that the section does not permit annexation under this statute in cases of overlapping police jurisdictions. In these cases, the Court added, 'annexations must follow conventional procedures.'
"* * *
 "D. The Probate Court also held that the annexation was void because its irregular shape and its lack of homogeneity with the rest of the city constitutes a violation of the legislative intent.
 "We know of no statutory mandate that the municipal boundaries of all territories sought to be annexed must form a regular shape. Tit. 37, § 135(10) does require that such annexed territory 'form a homogeneous part of the city or town.' But, this is not to imply that homogeneity demands regularity of shape of the boundaries of the municipality. 'Homogeneous' is defined as 'of a similar kind or nature . . . of uniform structure or composition . . . consisting of uniform elements (as of people or groups with similar background). . . .' Webster's Third New Inernational Dictionary, 1966.
 "Had the legislature been so disposed as to require all municipalities to possess boundaries of uniform and regular width and length it might have said so.
 "Other jurisdictions have permitted corridors and irregularly shaped boundaries such as those in the instant case. See Tovey v. City of Charleston, 237 S.C. 475, 117 S.E.2d 872 (1961); People v. City of Palm Springs, 51 Cal.2d 38, 331 P.2d 4 (1958); City of Burlingame v. San Mateo County, 90 Cal.App.2d 705, 203 P.2d 807 (1949). *Page 590 
 "Clearly, the proposed annexation is no sham or subterfuge because the City of Dothan has a valid municipal interest in its own municipal airport.
 "Therefore, we have concluded that there is no violation of the legislative intent in the proposed annexation."
295 Ala. 131, 134-35, 324 So.2d 772.
In City of Tuskegee v. Lacey, Tuskegee, using a different statutory scheme from that employed here, sought to annex the Macon County Dog Track property, which was about 14 miles from the nearest property within the Tuskegee city limits. In order to meet the contiguity requirement, Tuskegee sought to also annex a 14-mile-long corridor that consisted solely of the rights-of-way of public roads. A majority of this Court upheld the annexation, noting that while City of Dothan involved a corridor consisting of private property as opposed to public property, "[t]here is no statutory requirement that the land be private rather than public, and we find no basis for reading this limitation into the statute." 486 So.2d at 396. Of course, in City of Fultondale, this Court specifically overruled Cityof Tuskegee, but reaffirmed City of Dothan.
 IV
There are three methods provided for in the 1975 Code by which a municipality may annex territory. Title 11, Chap. 42, of the Code of Alabama 1975, provides for annexation: (1) by elections held pursuant to the provisions of § 11-42-1, et seq. (Article 1 elections); (2) by petition of all the "owners," §11-42-20, et seq. (Article 2 petition); and (3) by elections held by cities of 25,000 or more (of which Birmingham is one), as provided for by § 11-42-40, et seq. (Article 3 tax exempt elections). Of course, the legislature can, by separate legislative act, annex territory into a city.
The method of annexation used by Birmingham in this case is that provided for by § 11-42-40 (Article 3 tax exempt election), the same method used in City of Dothan.
Birmingham frames the four issues it contends are presented by this appeal, as follows:
 "In a tax exempt annexation election held pursuant to Section 11-42-40, et seq., Code 1975, can a city calling for the election combine two or more areas which are dissimilar in land use, population density, topography and location?"
 "Does the Fourteenth Amendment to the Constitution permit a city calling for an annexation election to exclude from the annexation area scattered and isolated residences of electors who do not want to be annexed?"
 "Can an annexation be invalidated because Birmingham entered into an unenforceable agreement with an industrial neighbor to cooperate with that industry in future annexation policy?"
 "If the reasonableness of a proposed annexation is fairly debatable, will the courts defer to the judgment of the governing body of the city involved in enacting the annexation ordinance?"
Appellees summarize their concept of the issues presented and applicable principles of law, as follows:
 "May a municipality control the outcome of an annexation election involving geographically farflung and otherwise unrelated territories by drawing election boundaries so as to (1) include a majority of known favorable votes concentrated in one community on one end of a twenty mile corridor; (2) exclude known opposition, and (3) arbitrarily link the pocket of predetermined votes to the gerrymandered 'target' area? If so, Birmingham's actions may pass muster. However, in order to hold such conduct lawful, this Court must also impliedly if not expressly hold that rank manipulation of the electorate is beyond judicial review in the sphere of municipal annexation and that a city's burden in response to an abuse of discretion challenge is met by nothing more than incantation of the hope of 'future metropolitan economic development.' . . . Similarly, in order to sustain the actions of Birmingham under the facts presented in the instant case, the *Page 591 
Court must be prepared to look the other way in the face of Birmingham's efforts to 'wheel and deal' with corporate landowners through contractual undertakings designed to delegate or preempt the exercise of authority statutorily conferred upon the city.
 "This Court's affirmation of the trial court's attempt to check these abuses will not unreasonably preclude Birmingham from pursuing legitimate annexation goals. Perhaps to its own suprise, Birmingham's efforts at consensual annexation in other areas of the county (including areas in which annexation elections were held and subsequently challenged) have proved workable, expeditious, and largely uncontroversial. Of course, it is not the prerogative of Appellees or even this Court to suggest a particular course of action to the City. However, it is the duty of the Court to unhesitatingly stay any attempt on the part of Birmingham or any other governmental agency to play fast and loose with clearly established statutory standards and constitutional interests."
Birmingham concedes that "it is axiomatic that any city calling an annexation election wants to call it in an area in which it has a reasonable chance to prevail," but it contends that so long as it acts within its authority as granted by the legislature the courts should not interfere with its discretion.
 V
We now address Birmingham's first issue: whether Birmingham, acting pursuant to § 11-42-40, could combine two or more areas that are dissimilar.
The trial court held Birmingham's annexation was invalid because it combined "two completely dissimilar areas," which the court said "bore no reasonable relationship to each other in land use, population density, topography, or location."
The corridor annexation method followed by Birmingham in this case is exactly the method approved by this Court in City ofDothan v. Board of Commissioners of Dale County, 295 Ala. 131,324 So.2d 772 (1975), as we have already stated. Significantly, the statutory provisions used by Birmingham here, and by the City of Dothan in that case, now § 11-42-42(b), are the same. From the time of the enactment of the original tax exempt annexation statute, Act No. 677 of 1907 (Acts 1907, p. 614), the legislature required only that an area proposed to be annexed under its authority be contiguous "at some point," and provided that the area could "extend to or around the boundary line of any other city." See Section 2(9), Act No. 677 of 1907 (Acts 1907, pp. 604, 607), now Section 11-42-42(b). We note again that in City of Tuskegee v. Lacey, 486 So.2d 393 (Ala. 1985), Tuskegee used an entirely different annexation authorization, § 11-42-21, which permits annexation by ordinance upon petition of all landowners.
In the 1923 Code Committee's comprehensive revision of the two 1907 methods for the annexation of unincorporated territory, the "contiguous at some point" rule was modified in the code sections applicable to all cities (§§ 1754-1968, Code of 1923) to remove the "contiguous at some point" language and to substitute the requirement that remains today in §11-42-2(10), Code 1975, which now requires, under that method
(Article 1 election), that the annexed territory be "contiguous to the boundary" and "[form] a homogeneous part of the city or town"; however, in the article authorizing the tax exempt election method, applicable only to cities of 25,000 or more, §§ 1769-1819, the 1923 Code Committee retained in § 1783 the original 1907 statutory provisions that the annexation territory under this method need only be "contiguous to the boundary of the city at some point and [that they] may extendto or around the boundary line of any other city." (Emphasis supplied.) The requirement that the annexed territory "form a homogeneous part of the city or town," § 11-42-2(10), does not appear in § 11-42-42(b), which was the statutory method used in this case.
We note that in City of Dothan, this Court discussed the "homogeneous part of the city or town" language in that case as *Page 592 
if it was required in every Article 3 tax exempt annexation election case, and not solely to an Article 1 election annexation case. Apparently, the history of the two methods of annexation was not as fully presented in that case as Birmingham has presented it here. In any event, the central holding of City of Dothan is that in an Article 3 tax exempt annexation election case, the "homogeneous" requirement, evenif applicable, does not require "all municipalities to possess boundaries of uniform and regular width and length."295 Ala. at 135, 324 So.2d at 776. Also, in City of Dothan, this Court held that the annexation was "no sham or subterfuge," and was for a legitimate purpose.
Under the tax exempt method, the statute does not require the territory to form a homogeneous part of the city, and tax exemption provisions in §§ 11-42-58 and 11-42-59 contemplate that annexation areas may contain very dissimilar areas, both developed and undeveloped. The statute does not prohibit a city from combining in a single annexation some property that is, or may become, residential in character, and some areas that may be used for "mining, manufacturing, industrial plants or construction, or which [are] used or occupied as part of a railroad, or street railroad, or for any other quasi-publicuse." (Emphasis added.) § 11-42-59.
Following the rule of law set forth in City of Dothan, we hold that there was no requirement that the annexation territory be regular in shape or homogeneous in character. When a city finds "that the public health or public good requires that certain territory (described in the resolution) shall be brought within the limits of the city," as provided for in §11-42-41, it may annex property of mixed usage, not homogeneous with either the city or other parts of the annexation area, and the annexed may contain land developed, or suitable for development, for a variety of uses, including residential, industrial, commercial and quasi-public uses, which could include river ports and industrial parks, such as those which Birmingham seeks to promote at the Warrior River, at sites found to be suitable for development by the study made for the Birmingham Regional Planning Commission.
In City of Birmingham v. Mead Corp., 372 So.2d 825 (Ala. 1979), this Court approved the annexation of ten square miles of undeveloped territory by an election in which a small community at one corner of the territory was linked to a large industrial development area. Only 60 votes were cast in favor of the annexation of an area about 10 square miles. There, the voting community was not directly contiguous to the city, and like Dolomite, had to be connected to the boundary of the city by other territory contiguous thereto at some point. Other communities, like Sandy Ridge and Shannon, were excluded.
This Court held:
 "[H]owever, we cannot read that decision [City of Birmingham v. Community Fire District, 336 So.2d 502 (Ala. 1975)] to change the long-established rule that, in annexing territory, a city acts in its legislative capacity; and generally, if the municipality acts within its delegated authority, the wisdom or expediency of the annexation is not a concern of the courts. 1 Yokley, Municipal Corporations (1956 Ed.), Section 34. In this case, it is not questioned that the City of Birmingham followed a statute which provided for the procedure utilized in this annexation. The legislature delegated the authority to the City and it enacted an ordinance which in all respects comports with the statute. In doing so, it determined that it would best serve the needs of the City to annex the property involved in this litigation. In such circumstances, we cannot say that the City acted unreasonably:
 " 'The general rule is that if the reasonableness of a proposed annexation is fairly debatable, the courts will defer to the judgment of the council enacting the annexation ordinance. . . .
" '* * *
 " 'The legislative body of a municipality is given a very broad discretion in the determination of the reasonableness of an annexation, and it has been *Page 593 
repeatedly held that the courts will interfere only to correct an abuse of that discretion. . . .'
 "1 Yokley, Municipal Corporations, Section 34, supra.
 "It is true that this court recognized a rule of reasonableness in Community Fire District that it was not intended to permit the court to substitute its judgment for that of the legislative body. We agree with the rule announced by the Supreme Court of Missouri on the question of reasonableness in State ex inf. Mallet v. Joplin, 332 Mo. 1193, 1205, 62 S.W.2d 393, 398 (1933):
 " '. . . It was not for the trial court to decide whether, upon the facts shown to exist, the extension of the boundaries was necessary, but to determine whether or not, upon the facts shown to exist, reasonable men would differ as to the necessity of the extension. If the question of whether or not the territory involved should be included within the city limits was fairly debatable, that is, if there was substantial evidence each way so that reasonable men would differ about its necessity, then the decision was for the city council and the city electorate and not for the court. . . .' "
372 So.2d at 828-29.
Clearly, whether the land should have been included within the City of Birmingham in this case was "fairly debatable."City of Birmingham v. Mead Corp., supra. Consequently, the appellees' almost total reliance upon Community Fire District
is misplaced.
 VI
The second issue raised by Birmingham is whether the Fourteenth Amendment to the Constitution of the United States permits a city calling an annexation election to exclude from the annexation areas that are scattered and isolated and contain residences of electors who do not want to be annexed.
The court held that by combining the proposed Birmingport industrial area with the Dolomite area into a single annexation election "Birmingham has allowed the voters in Dolomite not only to determine their destiny, but also the destiny of the voters in Powhatan. That the votes at Powhatan would be of no import was a foregone conclusion." The Court found that by changing the annexation area to exclude some residential property, the city violated the voting rights of the residents excluded. We cannot agree.
The Alabama statute allows only residents of the annexation "territory" to vote. The exclusion of voters in unincorporated areas from voting in city elections was upheld in an opinion by Mr. Justice Rehnquist in Holt Civic Club v. City of Tuscaloosa,439 U.S. 60, 99 S.Ct. 383, 58 L.Ed.2d 292 (1978), in which the Court rejected arguments made in a dissent by Mr. Justice Brennan, which were similar to those relied on by the court below.
Moreover, not a single witness appeared who wanted to be included in the annexation area and who was excluded by Birmingham.
Admittedly, there was some "gerrymandering." Some residential tracts were eliminated in the Birmingport area along with other areas not suitable for industrial development allegedly because of terrain, flooding, or previous annexation to West Jefferson. Birmingham justified its gerrymandering on the basis that there were very substantial problems for Birmingham if isolated residents were annexed who could immediately demand police and fire service, and whose children would be put out of nearby county schools at the end of the current term and have to be bussed to distant schools in Ensley and Wylam. Whether those persons who were excluded would have changed the election results, we do not know, but at the most, only 125 persons were excluded, and as one witness testified, they could have simply been taken into Birmingham against their will. Although 17 votes were cast at Powhatan, and although the Clerk of the Jefferson County Circuit Court, Bessemer Division, opined that there were 11 eligible voters in the annexation area, it was the opinion of two witnesses that no voters actually lived *Page 594 
in the Birmingport election area. Birmingham explained this as follows: "Some persons who lived on land of which a part had been annexed were allowed to vote by the election officials appointed by the Probate Judge without protest, however." Birmingham argues that there were clearly good and substantial reasons for all changes in the election area made between July 9 and July 18. "It is not for the trial court to decide whether, upon the facts shown to exist, the extension of the boundary was necessary. . . ." City of Birmingham v. MeadCorp., 372 So.2d at 829.
Courts should not intervene in council decisions to require the annexation of persons who do not want to be annexed on a theoretical supposition that their votes might have affected the election results, but as Birmingham points out in brief:
 "Because the probate judge has been enjoined from certifying the election, the election is still subject to contest under the provisions of Sections 11-42-52. If there are voters who were prevented from voting and their votes would change the result, the election can still be set aside in such a contest filed within five days of the Probate Court's certification of the election."
Appellees rely strongly on City of Birmingham v. CommunityFire District, 336 So.2d 502 (Ala. 1976), in support of their claim that Birmingham engaged in illegal and unconstitutional gerrymandering. Applying the principles set out in City ofBirmingham v. Mead Corp., we are of the opinion that the trial court was not authorized to determine whether the annexation was a good or bad decision, only that it was "fairly debatable." We believe that Birmingham has shown reversible error on this issue.
 VII
Birmingham argues that the trial court impermissibly invalidated the agreement it had made with two industries.
The court below held that Birmingham's Birmingport annexation was invalid because Birmingham entered into an agreement with Drummond Coal Company and Alabama By-Products Corporation, companies owning large tracts of land in the Birmingport vicinity, and which were engaged in extensive coal mining operations in the general area. Under the agreement, proposed boundaries of the annexation area were modified to avoid interference with existing and future mining operations, and it was basically agreed that, in the future, the companies would offer suitable areas of their lands for annexations as mining operations were completed, and Birmingham agreed to make further boundary modifications by deannexation if requested, if the areas affected were unoccupied and petitions to annex other lands were submitted so that the contiguity of the annexation area would not be affected. The parties also agreed to consult one another on a regular basis as the port area development progressed. Birmingham candidly admits: "As a legal document, the understandings expressed with respect to deannexation and annexation are not enforceable as any such action will require approval of the city governing body at the time, and hearing procedures in the Probate Court, and possibly elections in which the entire electorate of Birmingham would vote under [§§11-42-200 through -204], Code 1975."
Birmingham argues that the agreement constitutes a reasonable set of policy understandings between it and industries that will become its neighbors if annexation is approved. Birmingham further argues that coal mining is not a natural urban activity, but that it is a major part of the economy of the Birmingham area and that "[m]ining is now a highly regulated industry with regulations which apply to mining within a municipality that are different from the regulations which apply to mining in an unincorporated area."
Birmingham asks this Court to apply the holding in City ofLeeds v. Town of Moody, 294 Ala. 496, 319 So.2d 242 (1975), to the agreement so as to invalidate some of its provisions as improper delegations of legislative authority, arguing that "the worst case scenario involves an invalid agreement that had no relation to the outcome of the annexation election." *Page 595 
In Ramer v. City of Hoover, 437 So.2d 455 (Ala. 1983), this Court recognized that Hoover had entered into an agreement with principal landowners to grant tax exemptions to residents voting in the election for a longer period than Hoover had authority to grant. That case bears similarities to this case. The Court there stated:
 "While we recognize that exemption from new taxes constituted an inducement for property owners to vote favorably for annexation . . . we cannot say that the trial court erred in refusing to invalidate the entire agreement and the annexation election because a portion of this inducement was held to be beyond the authority of the city to grant." (Emphasis added.)
Here, the agreement held out no inducement to voters in the election, because none was located in the "corridor."
The reasoning of the dissenting opinion — that the annexation election is void because no electors resided in the "corridor" — is misplaced. Appellees' argument that the invalid portion of the agreements affected the outcome is based upon the principle that Birmingham tricked the industries into getting their assent. In the brief, appellees argue:
 "Moreover, Birmingham impliedly concedes that the industrial parties to the agreements in question were, at least in some respects, opposed to the annexation, and compromised their rights on the basis of what Birmingham now blithely characterizes as 'unenforceable policy understandings.' Birmingham, represented and advised by able and experienced counsel, presumptively knew of the invalidity of these agreements at the time they were made. Under such circumstances, Birmingham's execution of the agreement smacks [of] bad faith and further confirms an attitude of almost wilfull indifference to both the statutorily and constitutionally based limitations on the exercise of its annexation prerogatives."
From this record, we cannot say that the invalid portions of the agreement affected the outcome of the election. Birmingham contends that the agreement here, at the most, "may have avoided costly litigation with the mining companies." We do not know exactly what type of litigation may have been avoided, but that question is not presented here. We only hold that the boundary as set in the annexation election is the boundary until it is legally changed.
 VIII
The fourth issue raised by Birmingham is whether the proposed annexation was "fairly debatable." We think that the reasonableness of the annexation was "fairly debatable"; therefore, we hold that the actions of the Birmingham City Council in adopting the annexation resolutions in this case were within the rules set out by this Court in City ofBirmingham v. Mead Corp., 372 So.2d 825, 828 (Ala. 1979), andEvans v. Stone, 473 So.2d 495 (Ala. 1985), and that the lower court erred in its holding that the Birmingham City Council abused its discretion by adopting the resolutions calling for a Dolomite-Birmingport annexation.
In City of Birmingham v. Mead Corp., supra, this Court held that the legislative discretion of the Birmingham City Council was very broad when it called for a tax exempt election under this very same statute. The Council decision was said to be one "the wisdom and expediency" of which "is not a concern of the courts," 372 So.2d at 828. This Court quoted with approval the statement in 1 Yokley, Municipal Corporations (1956 ed.) § 34, as follows:
 "The general rule is that if the reasonableness of a proposed annexation is fairly debatable, the courts will defer to the judgment of the Council in enacting the annexation ordinance. . . .
"* * *
 "The legislative body of a municipality is given very broad discretion in the determination of the necessity of the reasonableness of an annexation, and it has been repeatedly held that the courts will interfere only to correct an abuse of that discretion."
This rule was recently applied in Evans v. Stone, 473 So.2d 495
(Ala. 1985). *Page 596 
We hold, therefore, without setting out specific evidence of its findings, that the Birmingham City Council did not act arbitrarily and capriciously in the exercise of its legislative discretion in this case.
The judgment of the circuit court is reversed insofar as it declared the annexation election null and void and ordered the probate judge not to certify the results; but that portion holding that §§ 11-42-73 and -86 were severable is affirmed. The case is remanded for further proceedings consistent with this opinion.
AFFIRMED IN PART; REVERSED IN PART; AND REMANDED.
JONES, ALMON, SHORES and ADAMS, JJ., concur.
TORBERT, C.J., and BEATTY, HOUSTON and STEAGALL, JJ., dissent.